COMMISSIONERS DOUGLAS COUNTY, *et al.*, v. THE UNION PACIFIC RAILWAY CO., E. D.

*Error from Douglas County.*

1. TAXES: INDIAN LANDS.—As long as the title to land, lying within an Indian reserve remains in the United States, or in the Indians, or in both, the land is not taxable by the state.
2. ID: CONTINGENT EQUITY IN.—A mere contingent, conditional, and inchoate equity, obtained by a railway company in such lands, but which does not amount to a title, either legal or equitable, does not so divest the United States of their title to the land as to subject the same to taxation.
3. LANDS: TITLE TO.—Under a conditional purchase of said land by a railway company when by the terms of the contract of purchase, no patent is to be issued for the land, until all the conditions of the purchase are fulfilled, and if any one of the conditions of the purchase is not fulfilled, the railway company are to forfeit all their right, title, and interest in and to said land, and the same is to be sold again to other parties, and when it appears from the nature of the contract and the character of the parties that *time* is an essential ingredient of the contract, no title, legal or equitable, passes to the railway company, until they fulfill every condition of their contract.*
4. PRIMARY DISPOSAL OF.—The laws and treaties of the United States, and not the laws of the state, must govern in the primary disposal of the soil by the United States.

---

*1. EQUITY: SALE OF LANDS.—The maxim that equity considers that when land is sold on credit and the deed is to be made when the purchase money is paid, that the land at the time of the purchase becomes the vendee's, and the purchase money the vendor's—that the vendor becomes the trustee of the vendee with respect to the land and the vendee the trustee of the vendor with respect to the purchase money, is not applicable to such a case.

2. EQUITABLE TITLE.—It seems that the equitable title to land never passes until everything has been done, so that the land cannot be forfeited; so that, on tender of performance, the conveyance of the legal title can be enforced.

This action was brought by the railroad company to restrain the collection of taxes, levied for the years 1866 and 1867, on a quarter section of the 100,000 acres of land specified in the treaties with the Delaware tribe of Indians of May 30th, 1860, and of July 2d, 1861. [12 *Stat. at L.*, 1177.] The patent granted, pursuant to the provisions of these treaties and the amendments, was not issued by the government until 1868. In the defense it was sought to be shown that although the legal title to the land did not pass until that time, yet that the railroad company held such an equitable title thereto as to make it liable for the taxes named; and this claim was based upon the contract found in the treaty, the Pacific railroad bills and the acts of the parties thereunder. The record shows that it was a fact agreed upon that the purchase money for the land had not been paid in 1867; that $250,000, the balance in full of the bonds issued, was not paid until February 11th, 1868, but that the interest had been fully paid when due, and that it was further agreed that more than twenty-five miles of the road from Leavenworth westward had been completed and equipped in A. D. 1866. Other than the foregoing, the facts of the case rest in the said treaty and the Pacific railroad bills, extracts from which will be found in the briefs.

*Thacher & Banks*, for plaintiff in error.

*Wilson Shannon* and *J. P. Usher*, for the defendants in error.

*For plaintiff, Thacher & Banks* submitted:

1. By the statutes of Kansas all the property, real and personal, * * * the property of corporations, * * * shall be subject to taxation. [*Comp. L.*, 857.] Real estate includes lands * * * and all rights

thereto and interest therein, equitable as well as legal. § 1, *Comp. L.*, 838.

2. The general doctrine concerning lands is that when they are purchased of the government, even before patent is issued, they are the property of the purchaser and liable to taxation, and that such taxation is not an interference with the "primary disposition of the soil." *Carroll v. Safford*, 3 *How.*, 461; 7 *Ohio*, 156; 6 *id.*, 477; 10 *id.*, 156.

3. The right to tax attaches to donation lands as well as to cash entries, the land being segregated from the public domain. 4 *Wal.*, 210; 21 *Ark.*, 24.

4. The test of the right to tax is to enquire whether title had passed. 3 *How.*, 461; 13 *Pet.*, 450.

5. The title to the land in question had passed from the government prior to the levy of the taxes.

*a*) By the treaty of August 22d, 1850, the preference was given to the company to purchase. In the amendments thereto the Delawares, in "consenting to the sale," express the intent that no patent shall issue for the land, nor shall the sale be binding until the completion of the first twenty-five miles of road, when one-half of it is to be patented, the other half on completion of the road through the reserve. On failure to complete, etc., the company "shall forfeit to the United States all rights to the lands not previously patented, and the certificates of purchase shall be deemed canceled." In July, (2d,) 1861, it was provided by treaty that bonds should take the place of coin in the payment, and to secure these the company agreed with the government, as trustee of the Indians, that on failure to pay, a forfeiture should take place; and in case of a forfeiture of these *mortgaged* lands the company shall also forfeit the lands purchased, *not earned* and patented. It was further provided that no

patent should issue "for the lands so pledged" until the bonds are fully paid. [12 *Stat. at Large*, 1177–8–80.] In the assent of the president to the treaty, a forfeiture of the *mortgaged* lands is also provided for, and thereupon they are to become the *absolute property* of the United States in trust, etc. In the final ratification of the treaty by the senate—assented to—special reference is made to the lands in question as "*conveyed*" to the company, with a provision, in case of non-payment of interest, that the contract shall be rescinded, and that no patent shall issue for any part thereof "until the money price of such part shall be paid."

*b*)  The plaintiff below—a corporation—cannot avail itself of the favorable construction extended to the gov-. ernment as to the *status* of these lands. The facts showing the *status* of the lands are: *First*, the grant, with its provisions as to forfeiture, as accepted and ratified, constitute a mortgage. It is so denominated. *Second*, these treaty provisions carry the idea that the lands were *conveyed* to the company, the United States merely taking back a mortgage securing the payment of the purchase price. The giving of the mortgage was payment, as to pass the title.

*c*)  The United States, by becoming a party to a mortgage, incurs all the risks that any individual would incur as such party. *Bank of Metropolis v. U. S.*, 15 *Pet.*, 377; *see opinion Att'y Gen'l Cushing, cited* 1 *Am. Law Rev.*, 659; *Angel on Corp.*, —; 3 *Wheat.*, 172; *U. S. v. Zengey*, 1 *Pet.*, 115.

*d*)  The contract, being a legislative contract, must be strictly construed. *Sedgw. Const. L.*, 626, 632; 11 *Pet.*, 420.

*e*)  In law and in equity the mortgagor of lands continues the owner until foreclosure. 4 *Kent Com.*, 182,

183, [160,] *and Note a; p.* 180, *Note a;* 6 *Blackf.*, 213; *King v. Fire Ins. Co.*, 7 *Cushing*, 7; 3 *Sandf. Ch.*, 501; 2 *Hilliard Mort.*, 154–5, 235, 389–90.

*f*)  This contract, intended to be executed so far as the property is concerned, in Kansas, is a Kansas contract, and governed by the law of mortgages of that state. 1 *U. S. Stat.*, 92, § 32, *Judiciary Act; Swift v. Tyson*, 16 *Pet.*, 1, 393; *Wilcox v. Jackson*, 13 *Pet.*, 517; *Carrol v. Safford*, 3 *How.*, 462; *U. S. v. Morrison*, 4 *Pet.*, 124.

*g*)  In Kansas the mortgagee has merely a lien. *Chick v. Willetts*, 2 *Kas.*, 384.

*h*)  The remedies on this mortgage are the same as those available to all mortgagees; and the presumption is that it was the intent that the company would perform the conditions of the mortgagee when it was given. In considering, then, whether title passed to the mortgaged premises, the United States cannot assert any other intent.

6.  The payment of taxes on the land owned by the company is a paramount duty devolving upon them, unless relieved by express compact.  Any argument shielding them from this duty must be based upon a presumption that it was intended by the parties that the contract existing between them would be violated.  If this argument be valid as to taxes, it is equally so as to all other obligations and responsibilities incurred by the company.

7.  The right to tax includes the right to sell.  The record does not show any attempt on the part of the county authorities to sell any other interest in the real estate than the company had.  This in no way impairs the rights of the United States therein.  *Carrroll v. Safford*, 3 *How.*, 441.

8.  The same principles are applicable in the case at

bar as are applicable to all other cases where lands have been purchased of the government and no patent has issued. In these cases the lands are taxable as soon as the equitable title passes. 18 *Ark.*, 423; 12 *Cal.*, 56; 12 *Iowa*, 536; 12 *Wisc.*, 26; *id.*, 46; 4 *Wal.*, 210.

9. Lands conveyed by the United States cannot be considered a " means employed by the government for carrying on its operations," within the meaning of the cases holding property exempt from taxation on that ground. *Weston v. City of Charleston*, 2 *Pet.*, 468; *Sedgw. Stat. Const.*, 499; 16 *How.*, 426; 3 *id.*, 441.

*Wilson Shannon, for defendants,* maintained:

1. After stating the treaty stipulations substantially as in the last brief set forth: It will be seen that the company are not entitled to the land until the money price thereof is paid, and that they are liable to *forfeit* all their rights on failure to comply with certain conditions. The Indians do not cede the lands either to the United States or to the company, but they continue to belong to the Delawares, with a mere right on the part of the company to acquire a title thereto by performance of these conditions. The United States held no title to the lands, and merely agreed to act as trustee for the Indians. The company had not performed these conditions until A. D. 1868, when the patent was issued.

2. In A. D. 1866 and '67 these lands were not liable to assessment for taxation, being Indian lands. 5 *Wallace*, 751, 757; *Stat. of Kas.*, '66, 263, § 25, *p.* 264.

3. The doctrine, that on acquiring the legal title, ownership related back to the time of acquiring an inchoate equitable right, is not applicable to cases of this kind.

*By the Court,* VALENTINE, J.

The only question in this case which counsel desire to raise, or to have decided, is whether the northwest quarter of section number twenty-nine, township number twelve, range number twenty, in Douglas county, was subject to taxation for the years 1866 and 1867. This depends upon the question whether, at the time the land was assessed, the title to the .same had passed from the Indians and the Government of the United States to the Union Pacific Railway Company.

If the title had passed, so that the land belonged to the railway company, it was taxable; but if the title had not so passed—if the land still belonged to the Indians or to the United States, or to both—it was not taxable.

As the patent from the United States to the railway company had not been issued until the year 1868, it will hardly be contended that the legal title had passed. It is contended, however, that the equitable title had passed; that in equity the railway company were the real owners of the land, and therefore, that the land was taxable. We suppose it will be conceded, even by the defendants in error, that if the equitable title had passed to the railway company, if their title was perfect except that the company had received no patent, which is only the legal evidence of title, the land was taxable.

We are of the opinion that no title, legal or equitable, had passed. It is true that the railway company had some equities in the land, but they were mere contingent, conditional and inchoate equities that did not amount to a title. It is true that the company had made a conditional purchase of this land, but they were not to receive the patent therefor until all the conditions of the purchase were fulfilled; and if any one of the conditions

were violated; if the company failed to complete and equip twenty-five miles of their railroad from Leavenworth westwardly within five years; if they failed to complete and equip the whole of their railroad through the Delaware reserve within eight years; if they failed to pay the interest annually on the purchase money, secured by bonds, within thirty days after the same became due, or if they failed to pay the principal of said bonds at the time it should become due, they were to forfeit all their right, title and interest in and to said land, and it was then to be sold to other parties.— It will be perceived from the very nature of this contract, and from the character of the parties to the same, that *time* was an essential ingredient of the contract. / The contract was purely executory, and it was not intended that the government should be bound to execute its part of the contract, by parting with any portion of its land, unless the railroad company should fulfill every portion of its part of the contract first—and strictly within the time stipulated. It was not intended to have any law suits over the matter. The railroad company could not sue the government or the Indians, and it was not intended that the government or the Indians should, under any circumstances, be under the necessity of suing the railroad company. The government and the Indians chose rather to retain every portion of their title to said lands and thereby keep their remedy within their own hands.

In equity there is a maxim that equity will consider as done that which ought to be done, and that it will look upon things agreed to be done as actually performed. As an application of this maxim, equity generally considers that when land is sold on credit, and the deed is to be made when the purchase money is paid, that the land at the time the sale is made becomes the vendee's and

the purchase money the vendor's; that the vendor be-
comes at once the trustee of the vendee with respect to
the land, and the vendee the trustee of the vendor
with respect to the purchase money. But this maxim
never applies where *time* is of the essence of the contract,
and where the land is subject to absolute forfeiture on
failure of some condition of the sale being performed;
for there is no necessity in such a case for courts of equity
to resort to any such fiction, and equity never looks upon
a thing as done which ought not to be done, nor in favor
of any party except one that has a right to pray that it
may be done. In such a case no title, legal or equitable,
passes until every condition of the sale is performed;
and if such condition is not performed at the exact time
that it should be performed, no title ever passes. [*Bene-
dict v. Lynch*, 1 *Johns. Ch. R.*, 370; *Wells v. Smith*, 7 *Paige
Ch. R.*, 22.] The legal title to land never passes until
the legal evidence of such title is executed, and the
equitable title probably never passes until everything has
been done so that the land cannot be forfeited; so that
the person claiming to hold the equitable title could,
even after failure on his part, still tender performance,
within a reasonable time, if he should so choose, and
compel the conveyance of the legal title by a suit in
equity, if the adverse party be an individual, or by a
writ of mandamus against the officers of the govern-
ment, if the government be the adverse party.

In this case the conditions upon which the land was
sold had not all been performed when the land was as-
sessed. In 1866 and 1867 the purchase money had not
been paid, and, therefore, the patent had not been issued.
Hence, in 1866 and 1867 we think the railroad company
had no *title* to the land, legal or equitable.

It is undoubtedly true, when the parties so agree, that

title, both legal and equitable, may pass before the purchase money or any part of it is paid; but it can hardly be supposed that such title will pass against the consent of the parties in violation of their contract, and in violation of equity and good conscience.

On the 2d day of July, 1861, Thomas Ewing, jr., agent for the Leavenworth, Pawnee & Western Railroad Company (since changed to Union Pacific—now Kansas Pacific Railway Company) executed an instrument in writing, called a mortgage. Now, whatever this instrument may be called, it is absolutely ridiculous to suppose it has the attributes of a Kansas statutory mortgage. If it is such a mortgage, the railroad company, as mortgagor, possessed the entire title to the land, and the United States, as mortgagee, had nothing but a lien on the same—a mere security for the debt. After condition broken, the United States could not repossess themselves of the land, as provided in the treaty, and sell it as though no contract had ever been made with the railroad company, but they must commence an action in the district court of the state as provided in our statutes, obtain a judgment against the railway company, and have the land appraised and sold at sheriff's sale to satisfy said debt; and if the United States should not commence such action within three years after the cause of action accrued, they would be forever barred by our statute of limitations from commencing any action, or from ever setting up any claim or title to the land by virtue of the mortgage or otherwise. This doctrine seems to be too preposterous to be seriously considered. Under it the state law becomes the paramount law—the supreme law of the land, and the laws and treaties of the United States must yield thereto; [*but see Sub. 2, § 1, Art. 6, U. S. Const.*,] the State of Kansas has the paramount right

to control the authority of the United States with regard to making "regulations respecting the Indians, their lands, property, or other rights, by treaty, law or otherwise," [*but see Act of Admission, latter part of section. 1,*] and the state also has the right to "interfere with the primary disposal of the soil by the United States," and to give the land of the United States to a railroad company against the will of the United States, against their laws and against the treaty made with the Indians. [*But see Act of Admission, Sub. 5, § 3, and joint resolution of the legislature of Kansas, Comp. Laws,* 84;] this case, in some respects, is similar to the case of the State, *ex rel.,* Parker v. Winsor, [*Ante,* 362,] decided at this term, and for additional arguments and additional authorities we would refer to that case.

The judgment of the court below is affirmed.

SAFFORD, J., concurring.