TIMOTHY McMAHON v. JOSEPH C. WELSH, *as Co. Treasurer, &c.*

1. WYANDOTTE INDIAN TITLES; *Incompetent Indians; Taxation of Lands.* Under the treaty of January 31, 1855, between the United States and the Wyandotte Indians, a certain piece of land was patented by the United States to one Harley Coon, an incompetent Wyandotte Indian. In 1857 said patentee died, and the land descended to Mary Nichols, his half-sister and sole heir. In 1864 Mary Nichols sold said land to the plaintiff, and executed and delivered to him a regular warranty deed therefor. Under the treaty of February 23d, 1867, said sale was approved February 17, 1871, by the Secretary of the Interior. In 1870 taxes were levied on said land ·by state authority: *held,* That the plaintiff is not entitled to an injunction to restrain the collection of said taxes.

2. ———— *Injunction; Title and Interest of Plaintiff.* If the sale and conveyance from Mary Nichols to plaintiff, and the Wyandotte Treaty of February 23d 1867, are valid, the lands were subject to taxation in the year 1870, and the taxes complained of are legal. If said sale, conveyance and treaty are void, the plaintiff has no title or interest in the land, and for such reason has no right to the remedy of injunction to enjoin the collection of said taxes.

### *Error from Wyandotte District Court.*

INJUNCTION brought by *McMahon* to restrain and enjoin *Welsh* as county treasurer from collecting certain taxes on 120 acres of land in Wyandotte county, and from assigning a tax-sale certificate of said land duly issued to the county for the unpaid taxes, interest, and charges levied on said lands for the year 1870. The action was tried in the district court upon an agreed statement of facts as follows:

"1st. Plaintiff *McMahon* is the owner of the land in question. Defendant Welsh is the treasurer of said county.

"2d. Said land was patented under the Treaty of January 31st 1855, between the United States and the Wyandotte tribe of Indians, to one Harley Coon, who was designated in. said treaty as an 'incompetent Wyandotte Indian,' and the patent issued to him contained the usual limitation clause peculiar to all patents of lands to that class of Indians under that treaty.

"3d. Harley Coon died in 1857, and his land descended to Mary Nichols, his half-sister and sole heir. Said Mary sold the land in 1864 to *McMahon* by executing and delivering to him a regular warranty deed, for a consideration paid by him to her at that time, and *McMahon* went into possession under said deed, and remained in such possession up to the commencement of this suit.

"4th. Said sale to plaintiff was approved by the Secretary of the Interior February 17th, 1871, in pursuance of an investigation, hearing of the parties interested, and report made thereon, by Commissioners Irwin and Cobb, under the direction of the Secretary of the Interior, as provided in article 15 of the Treaty of February 23d, 1867, between the United States and certain Wyandottes and other Indians in Kansas.

"5th. There was assessed and levied upon and against said land a tax for the year 1870, as other taxes were levied and assessed against like property in the county of Wyandotte, the sum of $30.53, which was entered by the proper officers of the county upon the tax lists of the same for collection by the treasurer of said county. Said taxes were not paid, and said land was duly advertised and sold for said unpaid taxes, etc., and bid in by the treasurer for the county. Defendant now threatens and is about to issue to any person who will pay said taxes, penalty and charges, a tax-certificate, which said certificate, when assigned by the county clerk, will in due time entitle the holder thereof to a tax-deed for said land.

"6th. Said assessment and levy of taxes, and sale of said lands, are, and said tax-certificate issued will be, a cloud upon the title of plaintiff, and operate to his injury."

The district court, at the June Term 1872, held that the lands were subject to assessment and taxation in and for the year 1870, and that the taxes complained of were valid, and gave judgment against the plaintiff and in favor of the defendant for costs. Plaintiff brings the case here on error.

19—11 KAS.

McMahon v. Welsh, *Treasurer.*

*S. A. Cobb,* for plaintiff in error.

The sole question sought to be reviewed in this proceeding is, Was the land described in the petition of the plaintiff subject to sale for taxation for the year 1870? The land was patented to an "incompent Wyandotte Indian," under the treaty of January 31, 1855. The patent contained the usual restrictive clauses of all such patents, viz., that "the said tract shall never be sold or conveyed by the grantee or his heirs without the consent of the Secretary of the Interior for the time being, and with the further and express condition, as specified in the 4th article of the treaty with the Wyandottes of the 31st of January, 1855, that the lands are not to be sold or alienated for a period of five years." The sale of these incompetent Wyandotte lands, for any purpose, was absolutely prohibited by the treaty of 1855. The last clause of article 4 of said treaty declares that "None of the lands to be thus assigned and patented to the Wyandottes shall be subject to taxation for a period of five years from and after the organization of a state government over the territory where they reside; and those of the *incompetent classes* shall not be aliened or leased for a longer period than two years, and shall be exempt from levy, sale or forfeiture until otherwise provided by state legislation with the assent of congress." The clause, "shall be exempt from levy, sale or forfeiture until otherwise provided by state legislation with the assent of congress," is absolute, and forbids the sale or forfeiture of these lands as well for taxes as for any or all other purposes, until the legislation above provided for is had. 2 Black. Com., 281; and see "Opinions of Attorney General."

Under the original grant no power was delegated to the state to tax the land in question, or at most to subject the land to sale for taxes. Any sale or attempted sale of the land by the grantee or his heir was *void,* and not *voidable.* 3 Kas., 354; 2 Kas., 243; 5 Kas., 578; 10 Wall., 321. The sole question then is, how does the 15th article of the treaty of February 23d, 1867, change the condition of these incompetent Wyandotte

lands? The land in question in this case was sold in 1864, and came under the provisions of the latter clause of said article 15. An examination and report was made under the direction of the Secretary of the Interior, and the secretary approved the sale made to McMahon in the year 1864. The court below held that the approving act related back to the date of the deed in 1864, and that consequently the land, like land taken in pre-emption, became taxable from the date of the deed, and not the date of the approval of the deed by the Secretary of the Interior. Such a decision is absurd. If the approval of the secretary was not the operative act, and the one that solely vested any interest in the land in McMahon, then the original deed was not a void but a voidable deed. But this court says the deed was void: 2 Kas., 243; 3 Kas., 354; 5 Kas., 578; 10 Wall., 321.

The doctrine of relation is a fiction of law — the result of necessity, and never applied except to subserve the ends of justice, and to protect parties deriving their interests from the claimant. It cannot operate upon a void agreement. The contract or agreement must in no case be void *ab initio*, nothing more than voidable. It cannot be applied in a case to support the right of a third person, which right depends upon the arbitrary will of another person, like the case at bar, in which the Secretary of the Interior is vested with the power to declare the sale of 1864 to the plaintiff a nullity, to approve or change it, as the very right, upon investigation, might appear to him. (Art. 15 of said Treaty, 15 U. S. Stat. at Large, 515; 3 Washburne, 272 ; 9 Wall., 315; 13 Wall., 93; 4 Johns., 230.) If this sale of 1864 admitted of the application of the doctrine of relation to the extent to make the land chargeable for taxes from that date, then the land became taxable in 1865, and a good title under a tax-deed for the taxes of that year would have vested the land in the purchaser at the tax-sale, while as yet the plaintiff had acquired no title to the land himself. This is too absurd to be law. *Gibson v. Choteau*, 13 Wall., 93.

We submit, then, that in this last view the doctrine of re-·

lation applied would be destructive instead of productive of the ends of justice. The right to tax is absolute, not contingent. A decision by the Secretary of the Interior adverse to the sale to McMahon would destroy the right to tax this land; therefore the right to tax was contingent, not absolute. With respect to the public domain, the constitution vests in congress the power of disposition, and of making all needful rules and regulations therefor. Congress has the absolute right to prescribe the time, the condition, and the mode of transferring this property. The land in question could be disposed of only in conformity to this condition, viz., by the assent or approval of the Secretary of the Interior. 10 U. S. Stat. at Large, 1161; 13 Wall., 90.

*Cook & Sharp*, for defendant in error:

1. The agreed statement of facts show that the land was subject to taxation from and after the purchase by plaintiff in 1864. His grantor had the power to convey; and her deed was afterward approved by the Secretary of the Interior. We admit that as long as the land remained in the original patentee or his heirs and unaffected by other legislation it would not be taxable or subject to sale or forfeiture. 3 Kas., 354; 5 Kas., 578; 10 Wall., 321. The 15th article of the treaty of February 23d 1867, changed the conditions of this land, and materially changed the condition of the contract for the sale of the same. It provided that, "whereas many sales of land belonging to this class have heretofore been made contrary to the spirit and intent of the Treaty of 1855, it is agreed that a thorough examination and report shall be made under direction of the Secretary of the Interior in order to ascertain the facts relating to all such cases, and upon a full examination of such report and hearing of the parties interested the said secretary may confirm the said sales or require an additional amount to be paid, or declare such sales entirely void as the very right of the several cases may require." (15 U. S. Stat. at Large, 515.) The sale of the land in question to the plaintiff in

error took place in 1864, and is one of the many sales of land belonging to the incompetents referred to in the treaty of 1867, as will appear by reference to the agreed statement of facts.

The treaty-making power is one of sovereignty and binding upon the whole community, and every member thereof, and whatever contracts it engages in no other power in the country can legally delay, resist or annul. (1 Blackstone, 257; Puff. L. of N., B. 8, c. 9, art. 6.) Treaties when made in this country under the constitution of the United States become the supreme law of the land. *Blue Jacket v. Co. Com. Johnson Co.*, 3 Kas., 299; *Parker v. Winsor*, 5 Kas. 367.

The Indians interested in these treaties were Wyandottes, and those particularly referred to were "incompetents," a class who had been found on examination to be incapable of managing their own affairs, and needed the care and protection of the government; and when it became necessary to grant them lands as individuals, it also became necessary to throw around the title of the land thus granted these restrictions. In other words, it became necessary to protect both the person and the property. The property could only be protected by the government holding a check over its conveyance. This check or restriction to its sale, alienation, taxation or incumbrance, was one of sovereignty over the land, held and retained by the treating powers, and which ran with the land, and was not a mere privilege to the individual, a mere limitation of his power over the land in question, and of the power of others, or of the state. Therefore the treaty powers which made the treaty of 1867, being the same which imposed these restrictions and limitations, had full power and authority to remove the same, or to modify them to any extent they might see fit, and to the best interests of those holding under such treaties. (5 Kas., 372; *Irwin v. Marshall*, 20 How., 558.) The treaty of 1867 declares that all restriction upon the sale of lands to incompetents under the treaty of 1855, shall be removed after the ratification of that treaty. That treaty was ratified in October 1868, there-

fore all restrictions upon the sale of the lands were removed from that time.

This treaty of 1867 recognizes the fact that certain of these lands had been sold before that time contrary to the treaty of 1855; and although these sales were contrary to the spirit of the treaty of 1855, and contrary to the restrictions which were imposed upon the land, they were recognized by the treaty-making powers as sales; and if absolutely void, when viewed in the light of the treaty of 1855, we claim that they were by the treaty of 1867 lifted above the condition of absolutely void sales to those of voidable only. The treaty of 1867 authorized the confirmation of these sales by the Secretary of the Interior, or authorized him to declare them entirely void, "as the *very right of each case might require.*" In determining the rights of these parties the secretary acts in a judicial capacity. And while he may use his discretion as well as judgment, yet his conclusion and findings must be dictated by the joint direction of each, and not by his own will or private affection or by either. 1 Story's Equity, § 13.

2. These Indians were wards of the government, and looked upon and treated in the light of minors. Their power to sell was recognized by the treaty of 1867; and if the sale, whether before that time or afterward, was equitably made, it should be approved as the right of the case demanded. The equitable agreement between the parties, and the payment of the consideration were the operative acts, and the title passed as of that date, when approved as required by the treaty. (*Irvine v. Irvine,* 9 Wallace, 617–625.) Where a person has bought land and paid for it, the deed subsequently made in consequence does not confer a new title on him, but confirms the right which he had acquired by the purchase. The approval by the Secretary of the Interior of the deed to McMahon was not a new acquisition of title in McMahon, but only a confirmation of the right he had already acquired. *Carrol v. Safford,* 3 How., 441; *Stone v. Young,* 5 Kas., 229; *Stark v. Starrs,* 6 Wallace, 402; *Witherspoon v. Duncan,* 4 Wallace, 210, 117, 218.

The patent from the United States to the "incompetent" conveyed the land described therein to the "incompetent" absolutely in fee simple (subject to the restriction therein.) The restriction in the patent does not operate as a *condition*, but operates as a *personal disability* similar to that of minor, which the government was competent to impose, and which disability was removed under the treaty of 1867. Said deed was therefore only voidable, not void, and its subsequent approval passed the title as of the date of the deed. *Blue Jacket v. Comm'rs of Johnson Co.*, 3 Kas., 299–355; *Lowry v. Weaver*, 4 McLean, 82; *Doe v. Wilson*, 23 How., 457; 10 How., 477; 12 Wend., 156.

3. An equitable title is taxable. Gen. Stat., 1019, ch. 107, §§ 1, 2; *Witherspoon v. Duncan*, 4 Wall., 210.

The opinion of the court was delivered by

VALENTINE, J.: Only one question is presented to us for our consideration: Was the plaintiff's land subject to taxation for the year 1870? But involved in this are several others of a very difficult and delicate character. It may even be asked, whether the plaintiff has shown that he owns said land, or that he has owned the same at any time between the first day of January 1870 and the present time; and therefore, whether he is liable to pay any tax that may have been levied upon said land for the year 1870, or for any other year; and therefore whether he has a sufficient interest in the matter to maintain this action. The agreed statement of facts upon which the judgment in this case was rendered shows that plaintiff's land was originally a part of the Wyandotte reserve; that the United States, under the treaty with the Wyandotte Indians of January 31st 1855, issued a patent for said land to one Harley Coon, an incompetent Wyandotte Indian, and that said patent "contained the usual limitation clause peculiar to all patents of lands to that class of Indians under the treaty"—but what that "usual limitation clause" was, or is, we are nowhere informed. We are therefore left to infer that it was such as was authorized by said treaty of

January 31st 1855. The agreed statement of facts also shows that the patentee, Harley Coon, died in 1857, and that the land descended to one Mary Nichols, his half-sister, who was his sole heir. But whether Mary Nichols was an incompetent Wyandotte Indian, neither the agreed statement of facts, nor any other portion of the record, shows. It must therefore be presumed that, if she was an Indian at all, she was a competent Indian. The agreed statement of facts also shows that Mary Nichols sold said land in 1864 to Timothy McMahon, the plaintiff in error, and plaintiff below, for a consideration then paid, and executed and delivered to him a regular warranty deed therefor; that this deed was approved by the Secretary of the Interior February 17th 1871, in pursuance of article 15 of the treaty of February 23d 1867 between the United States and the Wyandottes and other Indians. The 4th article of the said treaty of January 31st 1855 reads as follows:

"ARTICLE 4. On the receipt by the commissioner of Indian affairs of the plot and schedule, lists of persons, and of the first proceedings of the Wyandotte Council, mentioned in the next preceding article, patents shall be issued by the general land office of the United States, under the advisement of the commissioner of Indian affairs, to the individuals of the Wyandotte tribe, for the lands severally assigned to them, as provided for in the third article of this agreement, in the following manner, to-wit: To those reported by the commissioners to be competent to be entrusted with the control and management of their affairs and interests, the patents shall contain an absolute and unconditional grant in fee simple, and shall be delivered to them by the commissioner of Indian affairs as soon as they can be prepared and recorded in the general land office; but to those not so competent, the patent shall contain an express condition, that the lands are not to be sold or alienated for a period of five years, and not then without the express consent of the president of the United States first being obtained; and said patents may be withheld by the commissioner of Indian affairs so long as in his judgment their being so withheld may be made to operate beneficially upon the character and conduct of the individuals entitled to them. None of the lands to be thus

assigned and patented to the Wyandottes shall be subject to taxation for a period of five years from and after the organization of a state government over the territory where they reside; and those of the incompetent classes shall not be aliened or leased for a longer period than two years, and shall be exempt from levy, sale, or forfeiture until otherwise provided by state legislation, with the assent of congress." 10 U. S. Stat. at Large, 1161.

Article 15 of the said treaty of February 23d 1867 reads as follows:

"ARTICLE 15. All restrictions upon the sale of lands assigned and patented to 'incompetent' Wyandottes under the 4th article of the treaty of 1855, shall be removed after the ratification of this treaty; but no sale of lands heretofore assigned to orphans or incompetents shall be made under decree of any court, or otherwise, for or on account of any claim, judgment, execution or order, or for taxes, until voluntarily sold by the patentee, or his or her heirs, with the approval of the Secretary of the Interior. And whereas many sales of land belonging to this class have heretofore been made, contrary to the spirit and intent of the treaty of 1855, it is agreed that a thorough examination and report shall be made, under direction of the Secretary of the Interior, in order to ascertain the facts relating to all such cases; and upon a full examination of such report, and hearing of the parties interested, the said secretary may confirm the said sales, or require an additional amount to be paid, or declare such sales entirely void, as the very right of the several cases may require." 15 U. S. Stat. at Large, 517.

Now under these treaty provisions was not this land taxable in 1870? We suppose it will be conceded that all these lands were taxable in 1870 if they were owned by any one else except the Indians. Then who owned the land upon which the tax in controversy was levied in 1870? The plaintiff claims that he owns the land at the present time, and unless he does now own it he of course cannot maintain this action — for a party who is not liable to pay a tax cannot restrain the collection of the same. But if the plaintiff owns the land now, he certainly owned it in 1870. The deed under which he now claims was executed in 1864. The treaty under which he now claims was ratified in 1868. And he has done

nothing since 1870 to make his title better or more perfect than it was before that time, except to furnish evidence to the Secretary of the Interior to show that his purchase of said land was in good faith, and for a sufficient consideration, and according to "the very right of the case" it ought to be his. Under the treaty of 1855 the title conveyed by the United States to the competent Wyandotte Indians for all lands assigned to them was a complete, absolute, and unconditional title, in fee simple. This title the Indians could of course convey, whenever and to whomsoever they chose. No restrictions, limitations, or prohibitions of any kind were imposed upon them. They could sell and dispose of their lands to the same extent, and in the same manner, that other people could sell and dispose of theirs. The incompetent Indians unquestionably held the same kind of title to their lands that the competent Indians did to theirs, except that the incompetent Indians could not sell or convey their lands for five years, and not then without the consent of the president of the United States. This restriction seems to be purely *personal* to the incompetent Indians, and does not affect their title to the land. It was simply an incapacity to sell, similar to the disability of a minor to sell his lands. Hence, admitting that Harley Coon, the incompetent Wyandotte Indian, could not sell or convey his said land to any one, still, could not Mary Nichols, who must be presumed to be competent, and to whom the said land descended in 1857, sell and convey it? Can it be possible that this restriction was intended to run with the land, and to rest upon any person and every person who might afterward own the same? Undoubtedly it was intended that those who were "competent to be entrusted with the control and management of their affairs and interests," should be entrusted with the control and management of their own affairs and interests in every respect; and therefore it must have been intended that if land descended from an incompetent to a competent Indian the competent Indian should have the power to sell and dispose of it as he might choose. But still, supposing the sale and

deed from Mary Nichols to the plaintiff are absolutely void, then has the plaintiff any title to said land? Can the president and senate of the United States, by a treaty with the Wyandotte Indians, transfer a title to land which had previously been and is then vested by a patent from the United States in an individual member of the tribe, and vest such title, or any title, in another person, whenever it may be supposed that "the very right of the case" requires the same to be done? If said sale was void, then this very thing is attempted to be done by article 15 of the treaty of February 23d 1867. Now, for the sake of argument we shall assume that said sale and deed from Mary Nichols to the plaintiff were void, and that said article 15 is valid; and assuming such to be the case, then we think the plaintiff became the owner of said land at the time said treaty of February 23d 1867 was ratified, (if not before,) for, according to the subsequent determination of the Secretary of the Interior the plaintiff was according to "the very right of the case" entitled to be held to be the owner of said land by virtue of said treaty at the very time the same was ratified. At that time his *right* to said land became complete. It is true, the legal evidence of his title did not then become complete. It was necessary for him to make the necessary proof first, and obtain said determination from the Secretary of the Interior, before the legal evidence of his title should become complete. The secretary did not and could not create his right to said land. That was created by the treaty. The secretary merely furnished him with the legal evidence of the right which said treaty had already created. The decision of the secretary was therefore very much like that of any ordinary court of justice. It did not create a right, but merely determined who held the preexisting right, and furnished the legal evidence of that right. Now, as the legal evidence of the plaintiff's title was not complete until after said determination of the Secretary of the Interior, it may be claimed that the plaintiff held only an equitable title up to that time. But it must be admitted that such equitable title was complete, absolute, and perfect.

And land held by such a title has everywhere been held to be taxable. (See defendant's brief, and cases there cited; also, cases cited in *Stone v. Young*, 5 Kas., 232, showing that the holder of the land-office certificate, before the patent issues, is the real owner of the land, and that such land is taxable.) And in cases where land has been held not to be taxable this principle has been conceded. (*Parker v. Winsor*, 5 Kas., 362, 373; *U. P. Rly. Co. v. Douglas Co.*, 5 Kas., 615, 621; *K. P. Rly. Co. v. Prescott & Culp*, (U. S. Sup. Court,) 9 Kas., 39, 44, note.) But if said sale and deed from Mary Nichols to the plaintiff are void, and if said article 15 of the treaty of February 23d 1867 is void, and if Mary Nichols is still the owner of said land, then the plaintiff in this action has no right to the remedy of injunction to enjoin the collection of the taxes on said land. Therefore, in any case, or from any standpoint, the plaintiff cannot maintain this action. The judgment of the court below must be affirmed.

All the Justices concurring.