*519 The .opinion of the court was delivered by
Brewer, J.:
Gray recovered a judgment in the district court of Wyandotte county for the possession of certain lands, to reverse which judgment this proceeding in error is brought. The land in controversy was patented to Sarah Hicks, an orphan Wyandotte Indian, under the provisions of the 4th article of the treaty of January 31st, 1855, between the United States and the Wyandotte tribe of Indians. The patent bore date September 1st, 1859, and contained the usual restrictive clauses of such patents; among others, that the land was “not to be sold or alienated for a period of five, years.” The patentee died November 25th, 1860. By regular and unquestioned conveyances, her heirs conveyed the land to one Millar, and Gray, the defendant in error. 'Millar subsequently conveyed his interest to Gray, so that the latter is the undoubted owner, unless his title fails by reason of the proceedings now to be noticed. Three judgments were rendered against the patentee before justices of the peace, which on May 3d, 1860, were filed in the district court of Wyandotte county. On September 27th, 1860, execution was issued, and on November 20th, 1860, the land was sold to Jacob Casteel. The sale was thereafter confirmed, and a sheriff’s deed made to the purchaser, from whom by successive conveyances the plaintiffs in error acquired their title. This sale of the land to Jacob Casteel was approved by the Secretary of the Interior on the 17th of February, 1871, upon the report of a commission appointed under the 15th article of the treaty of February 23d, 1867, between the United States and certain Wyandottes, and other Indians in Kansas. Mr. Gray, the defendant in error, appeared before the commissioners under that article, whose sessions were holden in Wyandotte county, and presented his case, and pressed his claims for the approval of the Secretary of the Interior of the deed to himself and Millar.
Upon these facts three important questions arise: First, Did the proceedings in the district court convey a good title *520 to the purchaser? Second, If not, did the confirmation of this sale by the Secretary of the Interior make the sale a valid one, and operate to divest the heirs of the patentee and their vendees of all title, and vest it in the grantee in the sheriff’s deed, and his vendees? Third, Was the appearance of Gray before the commissioners a submission o‘f his claims to a competent tribunal, so that their report, and the subsequent action of the Secretary of the Interior thereon, cut off all his claims in the premises, on the principle of res judicata ?
I. Did the proceedings in the district court convey a good title to Jacob Casteel? • In order to answer this question we must ascertain under what restrictions Sarah Hicks, the patentee, held the title, for no question is made as to the regularity of the court proceedings. By art. 3 of the treaty of January 1st 1855, a commission was organized whose duty it was to divide the lands of the Wyandotte nation equally among all the individuals and families of the Wyandotte tribe. A plat and schedule were to be made showing the lands assigned to each, and the quantity thereof. Lists of all the members of the Wyandotte tribe were to be prepared, and the members arranged in three classes, to-wit, first, competent heads of families, and persons without families; second, incompetent heads of families; and third, orphans, idiots, and insane. On the receipt of the plat, schedule and lists by the Commissioner of Indian Affairs, it was provided by art. 4 that patents should issue for the lands so assigned. The patents to those reported competent, were to contain an absolute and unconditional grant in fee simple. The patents to those not competent, were to contain “an express condition that the lands are not to be sold or alienated for a period of five years; and not then without the express consent of the President.” The Commissioner of Indian Affairs was authorized to withhold these last patents so long as in his judgment the withholding would operate beneficially upon the individuals entitled to them. None of the lands assigned and patented were to be taxable for five years after the admission of the state; and “those of the incompetent classes were not to be *521 aliened or leased for a longer period than two years, and were to be exempt from levy, sale' or forfeiture until otherwise provided by state legislation, with.the assent of congress.” It was held by this court in McMahon v. Welsh, 11 Kas., 280, that these restrictions on alienation were- personal to the individual, and not running with the land, and that therefore when land passed by descent from an incompetent to a competent Indian, the restraint on conveyance ceased, and the right to convey became absolute. (See also Blue Jacket v. Comm’rs Johnson County, 3 Kas., 299; Lowry v. Weaver, 4 McLean, 82.) It would hardly - be contended that the sheriff sale conveyed any title, providing, these restrictions still attached. It was specifically provided that the land was to be. exempt from levy, sale, or forfeiture, until otherwise provided by state legislation, with the assent of congress. None such had then been had. The state was not even admitted. It was also provided that the land was not to be sold or alienated for a period of five years, and that period had not then elapsed. Each of these provisions would, under the “enlarged rules of construction adopted in reference to Indian treaties,” have avoided this attempted alienation by sheriff's deed. (The Kansas Indians, 5 Wall., 760; Comm’rs of Miami County v. Wan-zop-pe-che, 3 Kas., 364; Pennock v. Monroe, 5 Kas., 578.) But it is contended that these restrictions attached by reason of orphanage, and that when that disability ceased all restrictions were at an end, and the land was held subject to the same unrestricted power of alienation as the lands of the competent Indians. It appears from the affidavits filed before the commissioners under the treaty of 1867, that Sarah Hicks was competent to manage her affairs in 1859 and 1860, and she was also then of age. There is great force in this argument, but after a careful study of the treaty wé are constrained to hold that such is not the import and intention of its terms. It seems to us that the parties to the treaty intended, after dividing the Indians into competent and incompetent classes, that the restrictions imposed on the latter class should be absolute, *522 and not dependent upon the changes of the future. The competency was determined by the classification, and the restriction followed the classification. It was not during insanity, or orphanage, that the restriction lasted. If an incompetent head of. a family conveyed his land, the validity of the conveyance was not to be determined by the verdict of a jury as to his competency acquired subsequently to the classification. That would have made the restriction of comparatively little value, and exposed the Indian to the very dangers which were intended to be guarded against. Uniformity in protection was intended, and protection dependent on the federal authorities, and not on the judgment of his neighbors, eager for his land and anxious for his removal. The sale therefore by the sheriff was void, divested the patentee of nothing, and transferred nothing to the purchaser.
II. Did the confirmation by the Secretary of the Interior validate the sheriff sale, and vest in the purchaser and his vendees a good title? Can the title to land, patented to an individual, be divested by a treaty between the tribe to which he belongs, and the government? It is probably unnecessary for the determination of this case to consider the question as thus broadly presented. Art. 15 of the treaty of 1867, (15 U. S. Stat. at Large, 517,) is the only one that bears upon the question. It provides for the removal of all restrictions upon the sale of lands assigned to the incompetent 'Wyandottes, except in certain specified cases, and in so far as it simply removes the restrictions it is prospective in its operations, and can have no bearing upon prior-attempted alienations. It then declares that, “whereas, many sales of land belonging to this class have heretofore been made, contrary to the spirit and intent of the treaty of 1855, it is agreed that a thorough examination and report shall be made, under the direction of the Secretary of the Interior, in order to ascertain the facts relating to all such cases, and upon a full examination of such report and hearing of the parties interested, the said secretary may confirm the said sales, or require an additional amount to be paid, or declare such sales entirely *523 void, as the very right of the several cases may require.” This is tantamount to giving the assent of the government to past alienations. By the treaty'of 1855 the incompetents held their lands with power of sale after the lapse of five years, subject to the approval of the government. This section may be considered as providing for an examination of sales made subsequent to the five years, with a view of ascertaining which ought to be approved, and which not. If this were the sole purport of the section, perhaps no valid objection could be raised to the power assumed. The language, however, is broad enough to cover all sales, whether made before or after the lapse of the five years. As to a sale made prior to the lapse of five years, if the controversy were between the patentee and the purchaser, it would present a very serious inquiry as to the power of' congress. (Smith v. Stevens, 2 Kas., 250; same case, 10 Wall., 327.) But here the controversy is between the purchaser from the heirs of the patentee, and the party holding under the attempted sale by the sheriff. The sale by the sheriff was in defiance of the positive prohibition of the act of congress, and was therefore absolutely void. The title passed free from any lien or incumbrance to the heirs. It was held by them by an absolute title, and under an unrestricted power of alienation. They sold and conveyed for a valuable consideration to Gray. Under these circumstances it seems to us beyond the power, even if it was the intention of congress, by declaring a void sale valid, to divest a title which had passed through third parties by proper conveyances to the defendant in error, and vest it in the plaintiffs in error holding under the void sale. The title was not obtained • by Gray with notice of a sale, which under the existing laws the government by its approval could confirm. The only alienation attempted was one in defiance of law, and with no warrant in the statute for any subsequent confirmation and approval. He could then buy with impunity, knowing that no subsequent legislation could divest him of the title he was acquiring.
III. Was the appearance of Gray before the commissioners *524 a submission of his claims to a competent tribunal, so that their report and the subsequent action of the Secretary thereon cut off all of his claims in the premises, on the principle of res judicata? It does not seem to us that this section contemplated a tribunal for the determination of disputes between citizens of the state, as to the title to land, but only provided means for eliciting information to guide the government in giving or withholding its approval of certain attempted sales. In so far as its approval affected the validity of sales, it operated upon titles, and to that extent was equivalent to' a judicial determination. But for the reasons indicated in the consideration of the second question, it does not seem to us that it reached to or concluded the rights of the defendant in error.
The judgment of the district court is affirmed.
All the Justices concurring.