# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS, THE DISTRICT COURTS, AND THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA

---

### PICKENS et al. v. MERRIAM et al.*

(Circuit Court of Appeals, Ninth Circuit. June 6, 1921. Supplemental Opinion, August 1, 1921.)

### No. 3624.

1. **Executors and administrators ⟜59—Evidence held to show notes not in inventory were separate property of decedent's wife.**

In a suit to set aside quitclaim deeds covering the interests of grantors in the estate of a decedent, on the ground that the grantors were overreached by the administrators, evidence *held* to show that certain notes which were not included in the inventory of the estate were the separate property of the widow, who was one of the administrators, so that they were not to be considered in ascertaining the value of the interests conveyed by quitclaim deeds.

2. **Courts ⟜367—State decision, establishing effect of language in a conveyance, controls.**

Though ordinarily the interpretation of a contract presents a question of general law, on which the federal courts are not bound to follow the state court, decisions by the highest court of the state that a contract by which the owner agreed to convey if the payments were made at the times specified did not work an equitable conversion of the property, where the owner died before the time of performance of the contract, which had become a rule of property in the state before the execution of the contract in controversy, is binding on the federal courts.

3. **Courts ⟜366(16)—State decision, requiring equitable conversion of real property, is controlling.**

It is the exclusive province of the courts in the state in which the land is situated to determine its ownership and devolution and transfer, and whether there has been a conversion of the property from one sort to another.

4. **Descent and distribution ⟜90(4)—Evidence held not to show heirs were overreached by administrators.**

In a suit to cancel quitclaim deeds given by the heirs of decedent to the widow, who was one of the administrators, evidence of the value of the estate and the possibility of litigation regarding it *held* not to show that the administrators overreached the other heirs in procuring the quitclaim deeds for their interests in the estate; there being no misrepresentation of the facts.

---

5. **Descent and distribution �köö84—Use of estate funds, which would go to widow to pay for deeds to her, not fraud.**

Where all of the personal property belonging to an estate would go to the widow in any event, the use of the funds of the estate to pay for quitclaim deeds by the heirs to the widow is not a badge of fraud.

6. **Descent and distribution �köö84—Administrators owe utmost good faith in dealing with heirs.**

The administrators of an estate owe to the heirs the utmost good faith and fair dealing in procuring from them quitclaim deeds conveying their interest to the widow, who was one of the administrators.

Supplemental Opinion.

7. **Descent and distribution �köö12—Under California statutes a widow can dispose, in her lifetime or by will, of property inherited from husband.**

Under Civ. Code Cal. § 1386, subd. 8, providing that separate property of decedent's spouse, which came to decedent by descent, devise, or bequest, shall go to the children of the spouse or to the next of kin, the surviving spouse may dispose in her lifetime of any part of the property inherited from the deceased spouse, and may even make testamentary disposition of it, to the exclusion of the heirs of the deceased spouse.

8. **Descent and distribution ⊦köö12—Property inherited from spouse descends to spouse's heirs, unless its identity has been lost.**

The mere fact that property inherited by decedent from a predeceased spouse has changed its form, because of substitution of other property, does not affect inheritance by the heirs of the predeceased spouse, under the California statutes; but if the property has been so commingled with the survivor's other property that its identity cannot be traced, inheritance by the heirs of the predeceased spouse could not attach.

9. **Descent and distribution ⊦köö12—Widow's half of real estate is not inheritance under Kansas statutes.**

The right of a widow, under Gen. St. Kan. 1901, § 2510, to one-half of the real estate in which the husband at any time during marriage had a legal or equitable interest, is not an inheritance, but springs into existence by operation of law, and is not subject to the California statutes governing the descent of property inherited by a widow from her husband.

10. **Descent and distribution ⊦köö12—Widow's right to homestead under California statutes is not acquired by descent.**

The widow's right to the homestead set apart to her under the California statutes by the probate court is not a right acquired from her husband by descent.

11. **Deeds ⊦köö61—Delivery with intent to surrender control to third person, to be delivered after grantor's death, is effective.**

Where a grantor gave possession of a deed to a third person, with instructions to deliver it to the grantee on the grantor's death, and intended thereby to part with all control of the property during her lifetime, the deed becomes effective to pass the present title to the grantee, leaving the grantor a life estate only, and the third party is constituted a trustee for the grantee.

12. **Wills ⊦köö88(4)—Reservation of control of deed given to third person for delivery after grantor's death invalidates conveyance.**

Where the grantor, who gave a deed to a third person, to be delivered to the grantee after grantor's death, retained the right to control the deed during her lifetime, the conveyance is void as an attempted testamentary disposition without compliance with the required formalities.

13. **Deeds ⊦köö56(2)—Delivery depends on intent.**

The question of completed and effectual delivery of a deed is one of intent, to be gathered from the circumstances under which the attempted delivery was made.

⊦köö For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**14. Deeds ⚖️56(1)—Delivery may be constructive, as well as actual.**

An actual and formal delivery of the deed is never necessary, but delivery may be constructive, if from all the circumstances the grantor has made known his intention irrevocably to part with his dominion and control over the instrument, to the end that it may presently vest title in another.

**15. Deeds ⚖️61—Authority to agent to sell property and replace it defeats deed given to agent for delivery at grantor's death.**

Where grantor gave deeds executed by her to her agent, with instructions to deliver them immediately upon her death, her authority to the agent to sell any of the property in the meantime, if he could do so at a profit, renders the attempted delivery invalid, even though it was accompanied by directions to replace the property sold by other property.

**16. Cancellation of instruments ⚖️34(1)—Delay of six years after record of deeds and possession thereunder held laches, barring attack for want of delivery.**

Where the heirs waited six years after acquiring constructive notice of deeds delivered at grantor's death by the recording thereof, and after possession was taken by the grantees and the property was omitted from the inventory of the grantor's estate, during which time the grantees had made improvements on the property and had sold some of it, the heirs were guilty of such laches as bars their right to attack the deed for want of failure of delivery in grantor's lifetime.

**17. Equity ⚖️87(1)—Laches does not depend on statute of limitations.**

Laches does not depend on the statute of limitations, but may be incident to a term of longer or shorter duration than the statute prescribes.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Benjamin F. Bledsoe, Judge.

Suit by Louisa Pickens and another against J. H. Merriam and others to set aside quitclaim deeds. Charles F. Fensky and others intervene. Decree for defendants, and complainants appeal. Affirmed.

The complainants are sisters and two of the eight heirs at law of Ferdinand Fensky, deceased, aside from the widow. Fensky died intestate at San Pedro, Los Angeles county, Cal., August 7, 1903, being a resident and inhabitant thereof at the time. He left property, both real and personal, in Shawnee county, Kan., and in Los Angeles and Orange counties, Cal. M. T. Campbell was appointed administrator of his estate in Kansas, and the widow, Jeanette Fensky, administratrix of his estate in California. The estate in Kansas, classified for convenience and clarity, consisted of, first, real property; second, a number of contracts executed by Fensky and wife for the sale of real property, by which the purchasers obligated themselves to pay the balance of the purchase money to Fensky; and, third, personal property, consisting in the main of notes and mortgages to secure their payment.

The estate in Kansas was finally settled June 6, 1905, and that in California April 11, 1905. Jeanette Fensky, the widow, later died testate as to the Kansas property, being at the time a resident of Los Angeles county, Cal. Letters of administration with the will annexed of the estate in California were issued to J. H. Merriam, one of the defendants, August 14, 1908. On or about October 9, 1908, M. T. Campbell was appointed in Kansas administrator with the will annexed. These estates were both settled in due time.

The heirs at law of Ferdinand Fensky, namely Louisa Pickens, Johanna Schutt, Ida Wendt, Augusta Krauss, and Hulda Richter, sisters, Frederick Fensky and Charles Fensky, brothers, and George Fensky, nephew, prior to the settlement of the estates of Ferdinand Fensky, each assigned by quitclaim deed all right, title, and interest in and to all the real and personal property, wherever located, of Ferdinand Fensky, to Jeanette Fensky, the

widow, for the consideration of $1,000 each, except Frederick Fensky, to whom the consideration paid was $1,100. These assignments ranged in date from July to December, 1904, except Frederick's, which was executed in March, 1905.

In the settlement of the Ferdinand Fensky estates, both in Kansas and in California, the sales agreements or contracts for sale of real property, entered into prior to the death of Fensky, were treated as real property. As such they would descend to the widow under the Kansas statutes of descent.

It is claimed by complainants that Campbell, the administrator in Kansas, prior to March 30, 1905, remitted to Jeanette Fensky in cash and secured notes, being the proceeds of the assets of Fensky's estate, more than $30,000, and it is further asserted that, by reason of assignments of the heirs of Ferdinand Fensky of their title and interest in the estate to Mrs. Fensky, she was, upon the final account of her administration of the estate in California, awarded the entire estate as the only person entitled thereto; that she sold the real property in California, and realized therefrom more than $26,000; that with the money derived from these sources she purchased numerous parcels of real property in California; that prior to her decease, however, she conveyed, but without consideration, these parcels as designated in the bill of complaint, namely, items 1 and 6 to her sister, the defendant Alma J. Schmidt, items 2, 4, 9, 11, and 12 to her brother, the defendant Eugene Wellke, items 5, 7, and 8 to her sister, the defendant Amanda Katzung, item 3 to defendant Minnie S. Farnsworth, and item 10 to Corrine Loveland; that the defendant Don Ferguson claims to be the owner of item 3; and that after Jeanette Fensky's death the defendant J. H. Merriam became administrator of her estate, and administered a small amount of personal property only, which personalty was distributed to the heirs of Mrs. Fensky, except that $200 was paid to Laura M. Coughlin, which she claimed as a gift from deceased causa mortis.

The plaintiffs complain that the deeds from the heirs of Ferdinand Fensky, whereby they assigned and conveyed all their right, title, and interest in the Fensky estate to the widow, Jeanette Fensky, were procured by the misrepresentation, deceit, and fraud of M. T. Campbell, the administrator in Kansas, and the widow, whereby they were deceived and misled to their injury in that they were given to understand, and believed at the time and prior to the execution of such deeds, that the contracts for the sale of the real property entered into prior to Fensky's death, were real property, and were legally to be treated as such in the settlement of the estate, and as such descended to the widow, whereas their legal effect was to work an equitable conversion of the realty, and such contracts or agreements constituted personalty in the hands of the vendor, and as well in the hands of his estate, and as such would be distributed to the widow and heirs of deceased. It is further alleged that Campbell, the administrator, failed to account to the estate for certain personal property, namely, a note signed by W. C. Stein, and another by Simms, which notes, or their proceeds were turned over to the widow as her separate property.

It is also further alleged that the deeds made by Mrs. Fensky prior to her decease, to her brother and sisters, and to the defendants Farnsworth and Loveland, were without consideration, and were not delivered until after her death; that the defendant Merriam, well knowing that the real property described in the deeds did not pass thereby, yet nevertheless wholly omitted the property from his inventory of her estate, and settled the estate without accounting therefor; and, further, that he distributed the personalty to the heirs of Jeanette Fensky.

The prayer is that an account be taken of the property of Ferdinand Fensky, deceased, owned and possessed by him prior to his death; that the deeds of release and quitclaim executed by complainants to Jeanette Fensky be annulled; that an account be taken of the property and estate of Jeanette Fensky, and the sources from which the same were derived; that upon final hearing it be determined that all of the property owned by her at the time of her death is distributable among the heirs at law of Ferdinand Fensky; that it be deter-

mined that the deeds from Jeanette Fensky, under which the defendants, except Merriam, claim are invalid and void; that Merriam be required to account for the moneys distributed by him to the heirs of Mrs. Fensky; and for general relief.

The defendants Merriam, Wellke, Schmidt, and Farnsworth answered. Charles F. Fensky (a son of Charles Fensky, named in the complaint, now deceased), F. C. Richter (a son of Hulda Richter, named in the complaint, now deceased) and George J. Fensky, one of the persons named in the complaint, were permitted to intervene, and they demand relief substantially as prayed in the original bill. The decree was for defendants, and the complainants appeal.

Francis G. Burke, of Los Angeles, Cal., for appellants and intervener Charles F. Fensky.

J. H. Merriam and Jay D. Rinehart, both of Pasadena, Cal., and Robert B. Murphey and Hunsaker, Britt & Cosgrove, all of Los Angeles, Cal., for appellees.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). It is conceded that real property in Kansas descends to the widow, to the exclusion of the other heirs at law of the husband, and the personal property one-half to the widow and one-half to the heirs; that in California the widow is entitled to one-half of the separate property of the husband, both real and personal, but as to community property that the widow is entitled to three-fourths. It is further conceded that the real property of the decedent in Kansas was subject to distribution under the laws of Kansas, and that the personal property, whether in Kansas or California, and the real property in California were subject to distribution under the laws of descent in California.

The record shows by the inventory of the administrator that Fensky left certain real property, which is described, and which does not seem to have been appraised. This property, without question, descended to the widow.

By stipulation of counsel, it is agreed that prior to April 6, 1903, Ferdinand Fensky and wife executed contracts for sale of realty for about 29 tracts or parcels, and that the amount due on such contracts at the time of the death of Fensky was the sum of $22,965.75. The real estate in California was appraised at $6,200. Of this amount the homestead, valued at $3,000, was set aside to the widow in her own right, leaving for distribution $3,200.

The personalty in Kansas, consisting of notes secured by mortgages, was appraised at $16,630.50. To this should be added $4,297.14 money in hand, aggregating $20,927.64, found in the hands of the administrator, as per his inventory. On final settlement the administrator was directed to turn over to the widow all this property, less taxes and expenses of administration, which were $437.44. This does not include the administrator's charges for administering the estate, which were subsequently adjusted between the administrator and Mrs. Fensky at $1,500, by Mrs. Fensky canceling a note for that amount which she held against him.

The personal property in California was appraised at $500, to which should be added $100 as rent collected during administration. The taxes paid and expenses of administration, including allowance to widow, amounted to $1,719.62, of which the widow paid from her own funds $1,119.62. Thus it will be seen, of the property in California, both real and personal, $2,080.38 remained, all of which was turned over to the widow.

This accounts for the whole of the estate of Ferdinand Fensky, unless it be that certain other items should be added thereto, which will now be considered.

[1] The evidence shows quite clearly that the Stein notes, not included in the inventory, were the separate property of Mrs. Fensky. The notes were taken up, and another note given for $2,400, July 15, 1903, covering the whole, and made payable to Mrs. Fensky. This was prior to the death of Fensky. Aside from this, the notes were treated by both Campbell and Mrs. Fensky as her property. As to the Simms note, Simms states that prior to Fensky's death he borrowed money from Fensky. The widow claimed, however, that her husband gave her certain notes prior to his decease, and it will be found that the Simms note was treated by Campbell and Mrs. Fensky from the first as her property. The Kimmerle note was also so treated. Campbell's own note for $1,500 seems to have been so treated, and there is no evidence to the contrary showing it to have been the property of the estate.

The money claimed by plaintiffs on the two bank accounts in California by fair inference belonged to Mrs. Fensky, and so of the money paid to her through Campbell, her agent in Kansas, by the Citizens' State Bank of Kansas. The evidence, therefore, shows nothing to modify materially the foregoing results as to the amount of personalty of the Fensky estate coming into the hands of Mrs. Fensky, both from Kansas and from California, which, together with the balance of the realty, aggregates as nearly as can be ascertained $21,070.58. This takes no note of the contracts of sale. Of this sum the widow was entitled to one-half, and the other heirs each one-sixteenth.

A crucial question involved by the controversy is whether the contracts for the sale of the real property theretofore belonging to Fensky were legally and properly treated in the hands of his estate as real property, and as such descended to the widow. The Supreme Court of Kansas has passed upon the question in consideration of the very contracts here involved. Pickens et al. v. Campbell et al., 104 Kan. 425, 179 Pac. 343. The complainants herein sued M. T. Campbell and his bondsmen in the district court of Shawnee county, Kan., with a view to annulling the final settlement made by Campbell, as administrator in the Fensky estate, and compelling an accounting on the part of him and his bondsmen of the assets of the estate, and, to the end that plaintiffs might share in the result of the accounting, it was sought to set aside the releases given to Mrs. Fensky by complainants. A decree was rendered against the plaintiffs, and they appealed to the Supreme Court. The question determined was whether or not an equitable conversion had taken place by reason of the conditions of the contracts for

sale of the realty, and it was held that, because of the stipulation for forfeiture, time was made of the essence of the contracts, and therefore there was not an equitable conversion. We quote liberally from the opinion to show the final judgment of the court:

"It will be observed that the form of contract used was not one of present sale; it was one to sell. No obligation on the part of the vendor to convey arose, except on receiving the stipulated sums of money, at the time and in the manner specified. In case of default, the right to forfeit and to re-enter was expressly reserved. The forfeiture clause is identical with that appearing in the contract considered in the case of Drollinger v. Carson, 97 Kan. 502, 505, 155 Pac. 923. It was there said that such provisions are sometimes held to make time of the essence of the contract, citing 39 Cyc. 1369, 1370. It was not necessary to declare that such was the effect in that case, because, after default of the vendee, the vendor made time essential by demanding payment within a stated period, under penalty of forfeiture. That is just what the contract under consideration did at the beginning of the relations between the vendor and the vendee. Title was withheld; performance by the vendee at the time stipulated was a condition precedent to the acquisition of title; default entailed forfeiture of payments already made, and right of possession; the vendor was then at liberty to re-enter or to invoke the remedy of ejectment; and insertion of the formula, 'Time is of the essence of this contract,' would have been superfluous. * * * In this case most of the lots were sold for small payments, to be made during considerable periods of time, and it is quite clear that Ferdinand Fensky intended to forestall lawsuits by requiring purchasers to accept contracts which provided for strict performance, under penalty of forfeiture. The result is the contract is identical in all its legal aspects with the contract considered in Brown v. Thomas, Sheriff, 37 Kan. 282, 15 Pac. 211, and the vendor continued to be the owner of the land."

The court makes ample reference to the Kansas cases supporting its holding, and distinguishes them from other cases which it was contended held to the contrary. As this case is the last word of the Supreme Court of Kansas upon the question, we will not attempt further review of its utterances pertaining thereto.

[2] It is insisted, however, that the question is one of general character, involving the interpretation of a contract not in any way dependent upon the construction of state law, and that in such a case the federal court is not bound to follow the decisions of the state court construing the contract, but will impose its own independent judgment. The general proposition is sustained by authority, but it is without application here. It is now the settled rule of law by the federal courts that—

"Where, before the rights of the parties accrued, certain rules relating to real estate have been so established by state decisions as to become rules of property and action in the state, those rules are accepted by the federal court as authoritative declarations of the law of the state." Kuhn v. Fairmont Coal Co., 215 U. S. 349, 360, 30 Sup. Ct. 140, 143 (54 L. Ed. 228).

See, also, Burgess v. Seligman, 107 U. S. 20, 33, 2 Sup. Ct. 10, 27 L. Ed. 359; Bucher v. Cheshire Railroad Co., 125 U. S. 555, 583, 8 Sup. Ct. 974, 31 L. Ed. 795.

The rule applicable is well stated in Keene Five Cent Sav. Bank v. Reid, 123 Fed. 220, 226, 59 C. C. A. 225, 230, by the Court of Appeals, Eighth Circuit, as follows:

"Now, it is a well-settled doctrine that the proper interpretation of a private contract presents a question of general law, concerning which the federal courts are entitled to express an independent judgment, unless the contract is one relating to the sale or conveyance of real or personal property, and it contains words or phrases that, in virtue of local decisions, have acquired a definite meaning, and have thus become rules of property within the state. When such is the case the federal courts will interpret a contract as the state courts would interpret it."

[3] Aside from this, there is another principle which has application here. It is stated by Judge Story in his work on Equity Jurisprudence (volume 2, par. 1107):

"It is the exclusive province of the courts of the state of the situs of the property to determine its ownership, and its devolution and transfer, and whether or not there has been a conversion of the property from one sort to another. This is essentially so from the very nature of things, or else the state would have certain classes of property within its boundaries completely subject to the caprice and desires of nonresidents, and thus render nugatory its laws enacted for the purpose of protecting its own citizens and their property rights."

That the decisions of the Kansas Supreme Court have established a rule of property as respects contracts of the kind involved here can scarcely be disputed. The construction of the contract given in the Pickens Case, supra, seems to have been first announced in Douglas County v. U. P. Ry. Co., 5 Kan. 615, 621, and has since been consistently followed. Brown v. Thomas, Sheriff, 37 Kan. 282, 15 Pac. 211; Drollinger v. Carson, 97 Kan. 502, 155 Pac. 923.

These considerations lead to the conclusion that these contracts of sale did not work an equitable conversion of the real property concerned; that in their legal status, in view of the construction given them by the Kansas Supreme Court, they were properly to be considered and treated as real property, in the hands both of the vendor and his estate; and that they were rightfully so regarded in the administration and settlement of the estate. This disposes of the $22,965.75 item. The complainants could have no right, title, or interest therein.

[4] Turning, now, to the question, which is one of fact, whether the complainants have been misled and overreached in their transactions with Campbell and Mrs. Fensky, we have to consider the evidence bearing upon the subject. It is clear that Campbell and J. B. V. Goodrich, who was Mrs. Fensky's attorney and legal adviser in California, considered the question as to whether these contracts should be treated as realty with a good deal of care before any negotiations were attempted with the heirs of Ferdinand Fensky for the purchase of their interests in the estate by Mrs. Fensky. They concluded, and it seems rightly from a legal standpoint, that they should be so regarded. It was on this basis that Campbell carried on the negotiations with the heirs for the purchase of their interests. While it is true that he was at all times extremely solicitous that the heirs should not be advised as to the legal question involved, lest a lawsuit arise and thus delay the final settlement of the estate, it is obvious that he never at any time made any misrepresentations on the subject calculated to mislead them, or to induce them to do otherwise than they would have done with a

full understanding of the legal status of these contracts. In his endeavor to get a settlement for Mrs. Fensky, he wrote letters to some of the heirs, of which the following is a sample:

"5th July, 1904.

"Mr. Frederick Fensky, Leavenworth, Kansas—Dear Sir: Under the law of California, where Ferd Fensky died intestate, one half of his real and personal property in that state goes to his widow, and the other half to his brothers and sisters. The same rule applies to his personal property in this state, and I have been appointed administrator of his estate here, and have three years from the date of my appointment to close up the estate. The personal property here consists of notes and mortgages, and on their face amount in the aggregate, including money collected, to about $21,000. Quite a number of the debtors want more time in which to pay, and if Mrs. Fensky, the widow, was the sole owner of the notes, she could accommodate these people, and still collect nearly all of the money in the course of time. I can't be at all sure how much each heir, besides Mrs. Fensky, will be likely to realize out of the whole estate after all expenses and losses are paid, but I think somewhere in the neighborhood of $1,000. I have advised Mrs. Fensky that, if she can buy out each of the other heirs for $1,000 or less, to do so, and then make whatever terms she desires with those debtors who want more time on their notes. If you think favorably of the suggestion, and are willing to accept $1,000 in full of your share, please let me know soon, and I will will prepare an assignment of your interest and send you without delay. I am making the same proposition to the others, and think it will be accepted as the best thing for all parties concerned under the circumstances."

Considering the amount of property involved, that is, the personalty and the real property in California, with the trouble and expense to attend the settlement of the estate, and a possible failure in making some collections, this was not an unfair statement. At least, it does not have the earmarks of an attempt to mislead. Frederick Fensky, one of the heirs, however, looked into the matter very carefully, and employed a lawyer to advise him, and then reached a settlement. He was not called as a witness in the case.

Oscar L. Krauss, the husband of Augusta Krauss, advised his wife and others of the heirs, including Mrs. Pickens, as to their settlement with Mrs. Fensky. He was furnished by Campbell with the inventory of the estate filed in Kansas, and had a general knowledge of the affairs of the deceased, having known him for many years. Campbell told him pointedly that the "transactions in the so-called Fensky addition were all real estate." A good deal of time was taken up in procuring the settlements and the quitclaim deeds, and the heirs had ample opportunity to advise themselves particularly touching the condition of the estate before arriving at the settlements, and the record does not show that they were misled or overreached.

[5] It is true a part of the money which was the consideration for the quitclaim deeds was taken from the funds of the estate, but it was in anticipation of procuring the interests of the heirs that it was used, and the act can hardly be considered a badge of fraud. Mrs. Fensky was to come into the whole of the estate in the end.

By far the larger part of the testimony material to the issue consists in correspondence between Campbell and Goodrich and Mrs. Fensky. This correspondence speaks for itself. Campbell and Mrs. Fensky are both dead, and cannot speak for themselves. Goodrich has

not been called. The correspondence is voluminous, but, from a careful reading of it, it does not impress us as proving an imposition of fraud by Campbell and Mrs. Fensky upon the heirs of such a nature as to require a setting aside of the quitclaim deeds. As has been indicated, the heirs had ample opportunity for investigating for themselves, by independent inquiry, if need be, respecting the condition of the estate, and, finding no misrepresentation on the part of Campbell and Mrs. Fensky, or other imposition calculated to deceive or mislead them, we are impelled to the conclusion that the quitclaim deeds were not unfairly or fraudulently obtained, and should not be set aside or avoided.

[6] We have not overlooked the fiduciary relations existing between Campbell and Mrs. Fensky and the heirs, which require the utmost good faith and fair dealing, where the trustee is dealing with the cestuis que trustent respecting the property of the trust. But·in the present inquiry we find no such violation of the rules of propriety in this respect as to warrant a disturbance of the solemn contracts of the heirs, made with ample knowledge, or the ready means of acquiring it, of the conditions affecting them. A like conclusion has been reached by the Supreme Court of Kansas upon practically the same testimony, and that court speaks in high terms of Mr. Campbell and vindicates his good faith and sagacity as a business man.

Concluding, as we do, that the releases or quitclaim deeds of the heirs should not be disturbed, it results that the entire assets of the estates became the property of Mrs. Fensky at the time of the execution and delivery of the deeds, and what she was pleased to do with such assets subsequently would be no concern of the Ferdinand Fensky heirs.

This renders it wholly unnecessary to review the further questions presented by the record.

Affirmed.

## Supplemental Opinion.

A vital contention of appellants was overlooked in the former opinion in this case. The contention is that the complainants, being the sisters and a descendant of a deceased brother of Ferdinand Fensky, under the California statute were the heirs of Mrs. Fensky, there being no children of the marriage. This, it is claimed, is in pursuance of the second paragraph of subdivision 8, § 1386, Civil Code, which provides that:

"If the deceased is a widow, or widower, and leaves no issue, and * * * if the estate, or any portion thereof, was separate property of such deceased spouse, while living, and came to such decedent from such spouse by descent, devise, or bequest, such property goes in equal shares to the children of such spouse and to the descendants of any deceased child by right of representation, and if none, then to the father and mother of such spouse, in equal shares, or to the survivor of them if either be dead, or if both be dead, then in equal shares to the brothers and sisters of such spouse and to the descendants of any deceased brother or sister by right of representation."

This can have relation to such property only as came from the deceased spouse to the decedent by descent, devise, or bequest. Such

property as the decedent acquired otherwise would not be affected by the statute.

[7, 8] The Supreme Court of California has given construction to the first paragraph of subdivision 8, which has relation to community property (In re Brady's Estate, 171 Cal. 1, 151 Pac. 275), and the construction, it is obvious, is alike applicable to the latter paragraph. After the death of the spouse, if there be no issue, the property, if community property, the whole of it, becomes that of the surviving husband or wife, as the case may be, to deal with as though it were his or her own, and the heirs of the deceased spouse have a bare expectancy, which becomes effective, or ripens into an inheritance, at the death of the surviving spouse. and then only as to such of the property as he or she at that time possessed or owned. The surviving spouse may dispose of the property, or any part thereof, in any way desired, during his or her lifetime, and may even make testamentary disposition of it. In re Hill's Estate, 179 Cal. 683, 178 Pac. 710. The mere fact that the property has changed its form, type, or character, because of substitution of other property, does not affect the inheritance; but if the property is so commingled with the survivor's other property that its identity cannot be traced, then, of course, inheritance by the heirs of the deceased spouse could not attach.

[9] Mrs. Fensky did not acquire all the property of which she died possessed from her husband by descent. By section 2510, Gen. Stat. Kan. 1901:

"One-half in value of all the real estate in which the husband, at any time during the marriage, had a legal or equitable interest, which has not been sold on execution or other judicial sale, and not necessary for the payment of debts, and of which the wife has made no conveyance, shall, under the direction of the probate court, be set apart by the executor as her property, in fee simple, upon the death of the husband, if she survives him."

The Supreme Court of Kansas has determined that the estate coming to the wife under this statute is not an inheritance, "but springs into existence by operation of law upon a concurrence of the seisin and the marriage relation," and it was further determined that the only function that the probate court exercised in setting aside the property to the widow was to ascertain its value, and set it apart, "not as an heir of her deceased husband, but as her separate and absolute property in fee simple." McKelvey v. McKelvey, 75 Kan. 325, 89 Pac. 663, 121 Am. St. Rep. 435.

[10] Mrs. Fensky, therefore, became the owner in her own right, and not by descent from her husband, of one-half of the contracts for sale of realty in Kansas existing at the date of Ferdinand Fensky's death. These contracts amounted, as we have previously shown, to $22,965.75. Furthermore, Mrs. Fensky became the owner, in her own right, by purchase from the heirs, of one-half of the realty in California owned by her husband at the time of his death, as well as of his personalty. She also became the owner in her own right of the homestead set apart to her by the probate court in California in course of her settlement as administratrix of his estate. This she did not acquire by descent. Besides this, she had some property of her own, arising

from earnings before her marriage, including an amount, "a few hundred dollars," left her by a former sweetheart; and, as has been previously ascertained, the Stein notes, and the Simms, Kimmerle, and Campbell notes, and certain bank accounts, were her separate property. So that she became and was the owner, in her own right, and not acquired by descent from her husband, of much more than one-half of the property that came into her possession after the death of her husband.

It is very difficult to trace the property from the time Mrs. Fensky came into its possession, through the negotiations that took place prior to the settlement of Ferdinand Fensky's estates in Kansas and California, and through such settlement. By the record, there is no disclosure of any specific transfers of property, whether real or personal, prior to the time Mrs. Fensky attempted to deed different parcels of realty and assign certain mortgages to certain of her heirs; the specific date being September 18, 1907. She apparently sold all the real property in California that Ferdinand Fensky left at the time of his death, except the tract designated in the pleadings as item 8, and lot 10, Peck's subdivision of block 74, San Pedro, Cal., which latter parcel was a part of the homestead set apart to the widow. We find, however, that prior to and on the 18th day of September, 1907, Mrs. Fensky was the owner of the several tracts set forth in the pleadings, designated as items 1 to 12, inclusive. This as to the real property.

The only available evidence to be gathered from the record as to the amount of the personal property, with the exception of some items that will be noticed later, is the final account of the administrator touching Mrs. Fensky's estate. This account shows balance for distribution after payment of claims and charges for administration, $1,956.84, consisting of cash on hand, $906.84, and note of Don and Ona N. Ferguson, $1,050. This amount was distributed to Eugene Wellke, Alma J. Schmidt, and Amanda Katzung, share and share alike, after deducting $200 paid to Laura Coughlin, which was deemed a gift to her causa mortis, the obligation for which arose on account of the last illness of the deceased. The other items spoken of are the Stein note for $1,000, which was the separate property of Mrs. Fensky, and the Campbell note, also for $1,000. The latter was divided between Corrine Loveland and Minnie Farnsworth; $100 being paid in cash to each, and a note of $400 given to each by Campbell, which settled the obligation so far as he was concerned. This was done after the death of Mrs. Fensky, but in pursuance of her direction to Campbell in her lifetime, to wit, October 10, 1907, by letter which stated:

"Minnie to hold note. Corrine's share of principal and interest to be paid through Minnie."

The note was treated by the administrator as a gift to these parties causa mortis, and was not included in the assets of the estate. In addition to these items, two mortgages were assigned on September 18, 1907—the Ed. and Hattie Halbriter mortgage, to Eugene Wellke, and the Frank E. and Clara M. Webster mortgage to Amanda Katzung and Alma J. Schmidt—and given to Ferguson to hold in the meanwhile,

and to deliver to the assignees upon the death of the assignor. This took place at the same time the deeds were delivered to Ferguson to be held by him, and to be recorded at the death of the grantor, and was really part of the same transaction. The amount of these mortgages does not appear, but the Halbriter mortgage was paid prior to the death of Mrs. Fensky, presumably to her, through her agent, Don Ferguson.

The question is presented whether the several deeds signed by Mrs. Fensky, and acknowledged by her on September 18, 1907, and placed of record subsequent to her decease, purporting to convey distinct parcels of real property to the following individuals: Minnie S. Farnsworth, Eugene Wellke, Amanda Katzung, Alma J. Schmidt, and Corrine Loveland--were properly and legally delivered to the grantees so as to convey title. Lucius A. Parmele drew the deeds at the request of the decedent, who at the time was ill and confined to her bed, and took them to her bedside, where they were duly signed and acknowledged by her. Parmele relates the circumstances under which the deeds were given, in effect, that Mr. Ferguson, in the morning, gave him a list of the properties owned by Mrs. Fensky, and the names of the parties to whom she wished them deeded, and he drafted the deeds accordingly; that several persons were present at the time the deeds were signed; that—

"After she had signed the deeds, the question came up in regard to mortgages. She asked every one except Mr. Ferguson and myself to leave the room. They all left at her request. After they left the room she told me to which one she wanted the mortgages assigned. She directed Mr. Ferguson to take the papers and keep them--to continue to have control and charge of the property, and at the time of her death to record the papers covering such properties as she might have at the time of her death. She directed him to sell the property, or handle it just as if the deeds had not been given; that any property she owned at the time of her death, covered by the deeds, those deeds were to be recorded."

On cross-examination he said:

"She told me to deliver the deeds to Mr. Ferguson, and that Mr. Ferguson take them and keep them. * * * She directed Mr. Ferguson to keep the deeds in escrow, and to record any covering the property which she might own at the time of her death. * * * Q. Did she say anything to him as to how he might dispose of the property prior to her death? A. Not further than to handle it the same as it was her property, the way he had been handling, selling, buying, and trading property."

There was a will executed at the same time, by which Mrs. Fensky gave what property she owned in Kansas to the nieces and nephews of her deceased spouse.

Don Ferguson testified that he had bought and sold real estate for Mrs. Fensky from about 1905 until her death in 1908; that she spoke to him about making the deeds to her people, and that she wanted them all to have a home. He says:

"She stated that I was to hold the deeds until her death. * * * She said that she wanted to know that her people had a home and that if anything was sold it would be replaced, or words to that effect. She said I was to hold the deeds until her death and then put them on record immediately. She told me if I got a chance to sell any of this property at a profit to do it, and that

we would make it right, or words to that effect. I don't remember the wording. * * * The instructions were to hold them [the deeds] until her death. * * * At the time she delivered the deeds to me she made the remark that if I got a chance to sell anything at a profit to sell it and she would replace it. I think that is the word she used. She told me to record the deeds upon her death, and I did so."

Mrs. Farnsworth, the only other person to testify on the subject, says she heard Mrs. Fensky say to Ferguson to take the papers and hold them, and in case of her death to "record them the next day," and that she did not hear her say to Ferguson that, he could sell the property or handle it ʼas he used to. It further appears that prior to Mrs. Fensky's demise she gave a deed to one Chenoweth to a piece of property known as the Lewis tract, which was included in one of the deeds she executed on September 18, 1907. This property, however, it seems, she had sold to Chenoweth, on contract, prior to September.

[11] The question attending the delivery of a deed by the grantor to a third person, to be delivered to the grantee at the grantor's death, is one of intent, depending upon the attending circumstances and conditions under which the delivery is made. If it is the intention of the grantor to make such delivery absolute, and to place the deed ΄beyond his power thereafter to revoke or control, the act becomes effective to pass the present title to the grantee, which leaves in the grantor a life estate only in the property conveyed, and the third party is constituted the trustee, as respects the deed, for the grantee. Bury v. Young, 98 Cal. 446, 33 Pac. 338, 35 Am. St. Rep. 186; Wittenbrock v. Cass, 110 Cal. 1, 42 Pac. 300; Ruiz v. Dow, 113 Cal. 490, 45 Pac. 867; In re Cornelius' Estate, 151 Cal. 550, 91 Pac. 329.

[12] If, however, it is the intention of the grantor that the title shall not pass to the grantee at once, nor until after his death, the transaction partakes of the nature of a testamentary disposition, and does not become effective to vest the title in the grantee. The law has provided how such disposition shall be made, and, unless so made, it cannot be upheld.

"And," says the court, in Williams v. Kidd, 170 Cal. 631, 638, 151 Pac. 1, 3 (Ann. Cas. 1916E, 703), "the true test under which delivery is to be determined is in ascertaining whether in parting with the possession of the conveyance the grantor intended thereby to divest himself of title. If he did, there was an effective delivery of the deed. If not, there was no delivery."

An apt illustration is afforded by the case of Moore v. Trott, 156 Cal. 353, 104 Pac. 578, 134 Am. St. Rep. 131. There Moore mailed to one Tietzen some deeds to land, with directions to deliver them to the parties in case of his not returning from the hospital, where he had gone to have a surgical operation performed, and it was held that there had been no ΄delivery, because the directions left the inference that, if he returned from the hospital, the deeds were not to be so delivered. The case afterwards came up under a different showing, whereby it appeared that Moore, after coming out of the hospital, made declarations to several persons, other than Tietzen,ʼ that the deeds would be delivered when he would not be here, and, in effect, that he had disposed of a great deal of his property—had "deeded it," and left

the deeds with Tietzen to be delivered when he should pass away—and it was held that there was a delivery of the deeds, although Tietzen had not been advised of the grantor's changed determination. Moore v. Trott, 162 Cal. 268, 122 Pac. 462.

[13, 14] As has been previously stated, the question of a completed and effectual delivery is one of intent, to be gathered from the attending circumstances and conditions under which the attempted delivery is made. An actual and formal delivery is never necessary, and delivery may be constructive, as well as actual.

"Any words or acts showing an intention on the part of the grantor that the deed shall be considered as completely executed and the title conveyed, are sufficient." Kelsa v. Graves, 64 Kan. 777, 68 Pac. 607.

And so it was said in Moore v. Trott, supra, last cited:

"The delivery is sufficient and complete, if from any or all of the circumstances the grantor has made known his intention irrevocably to part with his dominion and control over the instrument, to the end that it may presently vest title in another."

[15] The principle being thus settled, we may inquire whether, by the delivery of these deeds to Ferguson, it was the fixed intent on the part of Mrs. Fensky that the title to the property covered by them should presently pass to the grantors. That Mrs. Fensky intended to make some disposition of the property is obvious. She was ill and confined to her bed. She had previously directed Ferguson, who had been for some years her agent in buying and selling real property, to have Parmele draw the deeds. A time was set for their execution, and there were present at the bedside of Mrs. Fensky, when the deeds were executed, besides Parmele and Ferguson, her sisters, Mrs. Schmidt and Mrs. Katzung, and her niece, Mrs. Farnsworth. The deeds were carefully executed and acknowledged, and a will was made by her at the same time, disposing of all the property in Kansas to the nephews and nieces of her deceased spouse in Kansas. The occasion was a solemn one for her, and she supposed, no doubt, that she was making proper distribution of the property touched by the deeds and the will among those who, she believed, ought to have it. She directed Ferguson to take the papers and keep them; but, according to Parmele, she further directed him to continue to have control and charge of the property, and at the time of her death to record the papers covering such properties as she might then have; to sell the property, or to handle it just as though the deeds had not been given, and "that any property she owned at the time of her death covered by the deeds, those deeds were to be recorded." Parmele did not attempt to give the exact language employed, because he could not recall it, but believed he had given the substance of what was said. Ferguson gives a somewhat different version of the instructions given him. He says:

"She said that she wanted to know that her people had a home, and that if anything was sold it would be replaced, or words to that effect. * * * She told me, if I got a chance to sell any of this property at a profit, to do it, and that we would make it right, or words to that effect."

Mrs. Farnsworth evidently did not hear all that was said, and it is probable that she was not immediately present at the time the directions were given. Now, what was Mrs. Fensky's real intent at the time of the delivery of these deeds to Ferguson? She does not seem to have retained any control over the deeds. They were gone beyond her recall, so far as the testimony shows. She did, however, authorize Ferguson, her agent, to sell such of the property as he could make a profit on, saying she would make it good, as we construe the testimony, to the grantee affected. This signified a purpose on her part that the deeds should not become presently effective, but that the lands should be dealt with by her as if the deeds had not been made, and an intention to convey good title to whomsoever the property might be sold to in the meantime. True, she signified her intention of making good to the grantees for any lands sold prior to her death; but this only strengthens the idea that she entertained a purpose to dispose of the property in the meantime, notwithstanding she was then deeding it to the parties designated.

The case, cited by appellees, of Haydon v. Easter, 24 S. W. 626, 15 Ky. Law Rep. 597, does not cover the precise situation, and is therefore not controlling. The idea is consistent, however, with a purpose to make a testamentary disposition of the property rather than a present passing of the title by irrevocable conveyance. The parties advising her on the occasion were not lawyers, and it was probably supposed that such a disposition was legally sufficient. For these reasons, we conclude that it was not the real intent and purpose on the part of Mrs. Fensky to convey a present title to the lands covered by the deeds, and therefore that the deeds were not effective to pass the title to the grantees named.

Appellees insist, however, that appellants have been guilty of such laches that a court of equity will not accord them the relief sought. The position thus asserted has relation to the transactions pertaining to the delivery of the deeds last above considered, and the settlement of Mrs. Fensky's estate, and the failure of complainants to take action with reference to the property concerned until such lapse of time as to render it inequitable for the court to take action in the premises. Mrs. Fensky died July 9, 1908. Petition was filed for appointment of an administrator August 1, 1908, and in pursuance thereof the defendant J. H. Merriam was appointed administrator with the will annexed. The administration pertained to personal property only, and the final account, as we have seen, showed for distribution among the heirs $1,956.84. This was distributed to Mrs. Fensky's heirs, after payment to Laura Coughlin of $200, and the administrator was discharged about October 13, 1909. This cause was commenced July 8, 1914.

Attempt has been made to charge Merriam with fraud and concealment in connection with his administration of the estate, which were detrimental to appellants' alleged interests in the property; but, without attempting to review the testimony relating to the subject, it is sufficient to say that, upon a careful examination thereof, we find that Merriam has been guilty of no fraud or deceit affecting appellants injuriously. The estate was settled in the usual course, and Merriam

was regularly discharged from his trust. The deeds Mrs. Fensky made to her heirs were filed and recorded the day after her death, and the grantees named therein entered into possession very soon thereafter. It was not deemed that the lands covered by the deeds were properly a part of the estate, and hence there was no attempt to administer thereupon. So that the entry into possession must have been nearly six years before the institution of this suit. The grantees, except as to certain parcels they have sold to outside parties, have been in continuous possession ever since, claiming title adversely to all the world.

The statute of limitations for the recovery of real property, which is five years (section 318, Code of Civil Procedure, Deering, 1915), has been pleaded, but stress is laid upon the laches of the complainants, as a defense to the suit, in the arguments and briefs of appellees.

[16] Mrs. Pickens, one of the appellants, testifies that the first knowledge she had that Mrs. Fensky had made the deeds to her heirs was in 1913. No other witness was called to the same purpose. Of course, Mrs. Pickens had constructive notice of the execution of the deeds from the date they were recorded. But, beyond this, the estate was administered in the usual way, accompanied with the legal notices and formalities required by law. Of this she must have had constructive notice, also. The evidence, however, tends to show that shortly after Mrs. Fensky's death some of the heirs of her deceased husband were inquiring into the affairs of the estate. This is particularly so of Fred Fensky and Richter. In this relation, it should be said that F. C. Richter and George J. Fensky are not now interveners in this cause, as erroneously indicated in the statement preceding the former opinion. They, with Charles F. Fensky, did seek to intervene, but later withdrew their petition.

The record of the deeds was open to inspection, and the fact was there apparent touching the date of the deeds and the date of their recording. This of itself was sufficient to induce inquiry why the deeds were not recorded until the day after the death of Mrs. Fensky. The two principal witnesses to the execution of the deeds, Parmele and Ferguson, were accessible. Had complainants gone to them, they would have readily obtained the truth in the premises. Instead of prompt action being taken, the estate of Mrs. Fensky was allowed to be closed and the balance of the property on hand to be distributed. In the meantime the grantees in the deeds have, in some instances, sold the lands deeded to them, in others they have paid off mortgages in considerable sums which were upon the property when it came to them, and in most instances they have made improvements and kept up repairs, and have paid the taxes incident thereto.

[17] Laches does not depend upon the statute of limitations, but may be incident to a term of longer or shorter duration than the statute prescribes. We think that, considering the attending circumstances and conditions, complainants have been guilty of such neglect in the prosecution of their suit as to leave them without remedy. Naddo v. Bardon, 51 Fed. 493, 2 C. C. A. 335; Raymond v. Flavel, 27 Or. 219, 40 Pac. 158; Wilson v. Wilson, 41 Or. 459, 69 Pac. 923. We come

274 F.—2

the more readily to this conclusion as it carries into effect the manifest purpose of Mrs. Fensky, she having the right to dispose of the property as she might desire, and upon the whole we deem it equitable and just, considering the disposition of the property in Kansas to the Fensky nephews and nieces.

Affirmed.

<hr>

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes