Pickens v. Campbell.

---

No. 21,994.

LOUISA PICKENS and JOHANNA SCHUTT, *Appellants,* v. DONALD A. CAMPBELL, as Administrator with the Will Annexed, etc., et al., *Appellees.*

### SYLLABUS BY THE COURT.

1. CONTRACT—*Sale of Real Estate—Time of Performance—When Essence of Contract.* It is not necessary that any particular form of expression be used to make time of performance by the vendee an essential element of a contract relating to the sale of real estate; and such is the effect of a contract of sale which conditions conveyance on performance at the time specified, and reserves to the vendor the right of forfeiture and the right of possession in case of default by the vendee.

2. SAME—*Executory Contract for Sale of Land—In Whom Title Rests—Contract Not Personal Property.* The equitable doctrine that, when

land is sold on deferred payments and the deed is to be delivered when the payments have been made, the vendor becomes a trustee of the title for the benefit of the vendee, does not apply to such a contract. The entire title remains in the vendor until the vendee has performed, and should the vendor die, the contract is not personal property, to be inventoried and administered as such by his personal representative.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed March 8, 1919. Affirmed.

*Lee Monroe, James A. McClure,* and *C. M. Monroe,* all of Topeka, for the appellants.

*Z. T. Hazen,* and *J. B. Larimer,* both of Topeka, for the appellees.

The opinion of the court was delivered by

BURCH, J.: This is a second appeal. The general nature of the controversy is indicated in the former opinion, *Pickens v. Campbell,* 98 Kan. 518, 159 Pac. 21. On return of the cause to the district court a trial occurred which resulted in judgment for the defendants. The plaintiffs appeal.

The chief subject of dispute was the nature of the uninventoried real-estate contracts, the real estate itself having been scheduled as such. In the former opinion it was said:

"Ordinarily the right to the purchase price of land, contracted to be sold but not conveyed at the time of the vendor's death, passes to his personal representative and not to his heirs. (*Gilmore v. Gilmore,* 60 Kan. 606, 57 Pac. 505; 18 Cyc. 187; 11 R. C. L. 124; Note, 57 L. R. A. 646.) The petition contains nothing to suggest a different rule here, but if the evidence should show that the administrator believed that the notes therein referred to followed the rule of real estate and became the property of the widow, no statements made by him in good faith by reason of that belief, however incorrect from a legal point of view, would warrant a reopening of the administration." (p. 522.)

As the quotation indicates, the precise nature of the contracts was not disclosed by the petition, and from certain ambiguous statements it was inferred that notes were given for the purchase price. It appeared at the trial that such was not the case, and that in each instance the only writing consisted of a contract in the following form:

"Witnesseth, That said party of the first part [F. Fensky], for the consideration hereinafter mentioned, covenants and agrees to sell and convey unto said party of the second part [the purchaser], his heirs and

assigns, all the following described real estate situated in the county of
Shawnee and state of Kansas, to wit: [Description of property].

"In consideration of which, said party of the second part covenants
and agrees to pay unto the said party of the first part, for the same, the
sum of [amount], as follows: [Terms of payment]. And said party of
the first part, on receiving said sum and sums of money, at the time and
in the manner aforementioned, shall at his own expense execute and de-
liver to said party of the second part a good and sufficient warranty
deed. . . .

"It is further agreed between the parties to these presents that said
party of the second part shall pay all taxes or assessments becoming
chargeable to or upon said premises after this date; and if default be
made in fulfilling this agreement, or any part thereof, by or on behalf of
said party of the second part, this agreement shall, at the option of said
party of the first part, be forfeited and determined, and said party of
the second part shall forfeit all payments made by him on the same, and
such payments shall be retained by said party of the first part in full
satisfaction, and in liquidation of all damages by him sustained, and he
shall have the right to reënter and take possession of said premises."

If the real-estate contracts were not personal property, they
had no place in the personal-property inventory, the adminis-
trator's motive in omitting them from the inventory was not
material, the plaintiffs had no interest in them, and the main
foundation of the suit fails.

It will be observed that the form of contract used was not
one of present sale; it was one to sell. No obligation on the
part of the vendor to convey arose except on receiving the stip-
ulated sums of money, at the time and in the manner specified.
In case of default, the right to forfeit and to reënter was ex-
pressly reserved. The forfeiture clause is identical with that
appearing in the contract considered in the case of *Drollinger
v. Carson,* 97 Kan. 502, 505, 155 Pac. 923. It was there said
that such provisions are sometimes held to make time of the
essence of the contract, citing 39 Cyc. 1369, 1370. It was not
necessary to declare that such was the effect in that case, be-
cause after default of the vendee the vendor made time essen-
tial by demanding payment within a stated period, under
penalty of forfeiture. That is just what the contract under
consideration did at the beginning of the relations between the
vendor and the vendee. Title was withheld; performance by
the vendee at the time stipulated was a condition precedent to
the acquisition of title; default entailed forfeiture of payments
already made, and right of possession; the vendor was then at

liberty to reënter or to invoke the remedy of ejectment; and insertion of the formula, "Time is of the essence of this contract," would have been superfluous.

In the case of *Douglas Co. v. U. P. R. W.*, 5 Kan. 615, the contract did not contain a statement that time of performance by the vendee was an essential element, but the court said:

"It is true that the company had made a conditional purchase of this land, but they were not to receive the patent therefor until all the conditions of the purchase were fulfilled; and if any one of the conditions were violated . . . they were to forfeit all their right, title and interest in and to said land, and it was then to be sold to other parties. It will be perceived from the very nature of this contract, and from the character of the parties to the same, that *time* was an essential ingredient of the contract. The contract was purely executory, and it was not intended that the government should be bound to execute its part of the contract, by parting with any portion of its land, unless the railroad company should fulfill every portion of its part of the contract first—and strictly within the time stipulated. It was not intended to have any lawsuits over the matter." (p. 621.)

In this case most of the lots were sold for small payments to be made during considerable periods of time, and it is quite clear that Ferdinand Fensky intended to forstall lawsuits by requiring purchasers to accept contracts which provided for strict performance, under penalty of forfeiture. The result is, the contract is identical in all its legal aspects with the contract considered in *Brown v. Thomas, Sheriff*, 37 Kan. 282, 15 Pac. 211, and the vendor continued to be the owner of the land. In the opinion in the case just cited it was said:

"The maxim that equity considers that when land is sold on credit, and the deed is to be made when the purchase money is paid, that the land at the time of the purchase becomes the vendee's, and the purchase money the vendor's; that the vendor becomes the trustee of the vendee with respect to the land, and the vendee the trustee of the vendor with respect to the purchase money, is not applicable here. . . . The legal title has not passed to him [the vendee], because no deed or other conveyance has yet been made; and the equitable title has not passed, because the land has not been paid for, and because—on account of the provisions for forfeiture—it is clearly the intention of the parties, as indicated in the contract, that such title shall not pass until the land is paid for." (p. 286.)

The plaintiffs rely on the case of *Gilmore v. Gilmore*, 60 Kan. 606, 57 Pac. 505, which was cited in the former opinion under the circumstances which have been stated. In the Gilmore case notes were given for the purchase price, time of perform-

ance was not an essential element of the contract, and no provision was made for forfeiture in case of default.

The plaintiffs cite the case of *Williams v. Osage Co.*, 84 Kan. 508, 114 Pac. 858. In that case the court expressly stated that the contracts involved differed materially from the contract considered in the Brown case, and quoted from the Douglas county case to illustrate the differences. The first contract in the Osage county case provided for a cash payment of $500, a payment of $2,000 on March 1, 1907, and a payment of $2,000 on March 1 annually thereafter until the full price of $12,000 was paid. Time was made of the essence of the contract and right of forfeiture was reserved, with respect to the payment due March 1, 1907, only. The litigation concerned the status of the contract in 1908, the vendor making no claim of default or ground for forfeiture occurring in March, 1907. The second contract involved in the Osage county case not only did not provide for forfeiture, but it expressly provided that in case of default the vendor might take such steps to enforce it as he saw fit.

The plaintiffs say the Brown case should be overruled. The court is entirely satisfied with the decision in the Brown case, but if it were not, it would hesitate to overturn a rule of property first announced in the Douglas county case in 1870, and recognized as late as 1911 in the Osage county case.

The record in the case vindicates not only Mr. Campbell's ability as a lawyer, but the good faith of his conduct and his sagacity as a business man. On September 4, 1903, John V. B. Goodrich, an attorney of San Pedro, Cal., wrote Mr. Campbell a letter advising him of Mr. Fensky's death and intestacy while resident in California, stating that Mr. Goodrich had been employed by Mrs. Fensky to settle the estate, and on behalf of Mrs. Fensky requesting Mr. Campbell to act as administrator of the portion of the estate situated in Kansas. On September 8, Mr. Campbell replied, consenting to act as administrator. He was already familiar with the Fensky interests here, and at the threshold of the contemplated administration was the question of what was real estate, descending to the widow according to the law of Kansas, free from interference by the administrator, unless needed for payment of debts, and what was personal property, to be inventoried and ad-

ministered, but finally to be distributed according to the law of California. So far as known, Mr. Campbell had never even heard of Mr. Goodrich before, and writing as one lawyer to another, he said:

"Of course all his real estate here will go to her under our statute, but I suppose all his personal property, which will include all notes and mortgages, will descend under the law of California. Is not that your understanding?

"An administrator here is quite necessary in view of the many mortgages and land contracts he left . . ., and if the administrator can act in the capacity of agent generally for her, it would simplify matters and perhaps be less expensive.

. . . . . . . . . . . . . .

"Give me your views of Mrs. Fensky's relation to the land and lot contracts for deed; if she is now the sole owner of the lands, and I think (without investigating the question) that she is, ought she not either to make new contracts in her own name, or give deed and take back mortgages for balances of 'purchase money? . . .

"Is it at all probable that the brothers and sisters will make any claim to the contracts for deeds for property here? As soon as I am appointed administrator I will be beseiged, and I want to know your views on some of these important questions before expressing my opinion."

On September 14, Mr. Goodrich replied, and, among other things, said:

"You ask me to give my views of Mrs. Fensky's relation to the land and lot contracts for deeds. My opinion is that Mrs. F., under your laws, is now the sole owner of said lands. . . .

"In relation to the brothers and sisters making any claim to the contracts for deeds, Mrs. F. says that she cannot tell what they will do; but so far as the personal property is concerned, and also the land here, I have advised her to compromise with and get their receipts in full for what interest they may have in the estate. If you have any suggestions to make along the line of such a compromise, please do so, and assist us in bringing the same about."

On September 18, Mr. Campbell wrote Mr. Goodrich as follows:

"I agree with you that land contracts for deed are not personal property, but that Mrs. Fensky is the sole heir at law and now the sole owner in fee of all the Kansas real estate, including that contracted to be sold, but subject, of course, to debts, if any, of deceased, and the rights of contracting purchasers, and thus we will treat the matter.

. . . . . . . . . . . . . .

"So far as the real estate here is concerned, she became absolute owner of it in fee upon her husband's death; and without reference to any pro-

bate proceedings, whether an administrator was appointed or not, she can do as she pleases with it, subject all the time and only to the claims of creditors, and we all know there are no creditors.

.    .    .    :    .    .    .    .    .    .    .    . .    .

"I think your idea of having Mrs. Fensky buy out the other heirs is a good one. It will simplify matters and shorten up the proceeding."

It thus appears that both lawyers, each acting independently of the other and on his own judgment, arrived at the same conclusion respecting the status of the real-estate contracts. There is not the slightest doubt that each one expressed his honest opinion. Both men were right, and in settling with the heirs, representations as to the nature and value of the distributable estate were neither false nor fradulent, because the real-estate contracts were not recognized as part of the personalty.

Having determined that the contracts were not personal property, and that the land affected belonged to the widow, Mr. Campbell exercised great prudence in preventing information respecting them from being noised about. To be blunt about it, he sedulously concealed their existence, as far as he could, and for the soundest business reasons. The circumstances were such that it would have been financially disastrous to involve the contracts in litigation. Covetous relatives of the deceased, with everything to gain and nothing to lose, and possibly having exaggerated notions of Mr. Fensky's wealth, would be likely to find lawyers who would institute speculative suits for them, just as occurred ten years later. As administrator, Mr. Campbell occupied no relation of trust or confidence toward distributees of personalty, with respect to real estate owned by the widow. He rested under no duty to such distributees to produce the contracts or to give information or advice concerning them; and the remarks of the learned trial judge, in a written opinion filed in connection with the decision of the case in the district court, are pertinent here:

"The matter of the character of Fensky's interest in these properties in Shawnee county was open for the investigation of any of the heirs. It was in fact investigated by Fred Fensky of Leavenworth, and by his attorney, and after such investigation the attorney evidently came to the same conclusion Campbell did. . . .

"Would a court be warranted in holding that Campbell was guilty of fraud under such circumstances? Unfortunately, before the trial of this cause he died. He is not here to tell his side of the story. It appears

that he was a lawyer in good standing at the bar for many years. Aside from any facts shown in evidence as to his uprightness, this court must presume, under the well-known rules of law applying to fraud, that he was honest and that his dealings were in good faith. It would be an unjust thing to blacken his character by a finding of fraud on his part because he believed that under the law this property belonged to Mrs. Fensky, and acted upon that belief. This court will not give support to so unjust a contention."

The conduct of Mr. Campbell with respect to some other matters was criticised. It is not necessary to discuss the evidence. The court concurs in the conclusion reached by the district court, that the evidence was entirely insufficient to convict Mr. Campbell of fraud or any bad faith in connection with the Fensky estate, or otherwise, and that the action was without merit.

The judgment of the district court is affirmed.