No. 44,986

In the Matter of the Estate of D. E. Snyder, Deceased. (DANNY SNYDER and ROBERT SNYDER, *Appellants*, v. T. D. HAMPSON, Executor under the Last Will of D. E. Snyder, Deceased, and MAY SNYDER, Appellees.)

(430 P. 2d 212)

Opinion filed July 12, 1967.

*Robert V. Talkington*, of Iola, argued the cause, and *Ben L. Humphreys*, of Girard, and *J. D. Conderman*, of Iola, were with him on the briefs for the appellants.

*Douglas Hudson*, of Fort Scott, argued the cause, and *Robert O. Karr*, of Girard, and *Douglas G. Hudson* and *David Mullies*, both of Fort Scott, were with him on the briefs for the appellees.

The opinion of the court was delivered by

KAUL, J.: The question presented in this appeal is whether or not a specific devise of real estate was adeemed in testator's lifetime.

D. E. Snyder, sometimes referred to as testator or deceased, purchased an 840 acre ranch situated in the northern part of Crawford County on March 27, 1950. Mr. Snyder and his wife, May, moved

onto the ranch in 1952 and resided there until 1959. On November 25, 1953, D. E. Snyder executed his will containing the specific devise in question pursuant to the terms of which the ranch was devised to his two nephews Danny Snyder and Robert Snyder, appellants herein, subject to certain conditions and limitations.

On September 30, 1959, D. E. Snyder and wife, May, entered into an agreement with Roy King Company, Ltd., a corporation, for the sale of the ranch for the sum of $63,000.00. The agreement, referred to hereafter as the King agreement or contract, designated the Girard National Bank as escrow agent and provided for the payment of $1,000 upon the execution of the contract, receipt of which was acknowledged; $1,500 on November 15, 1959; $2,500 on April 1, 1960; and $2,500 semiannually thereafter on October 1 and April 1 of each year for six years. It was further provided that at the end of six years, on April 1, 1966, the King Company should pay such additional amounts as necessary to make a total principal payment on the contract of $20,000, and then the King Company should execute a note and mortgage on the real estate for the balance of $43,000. The note and mortgage were to bear interest at the rate of five percent, payable semiannually and the principal was payable in 15 years, with the privilege of paying any or all of the principal at that time.

The contract further provided that Snyders were to pay the 1959 taxes and that thereafter the King Company was to regularly and seasonably pay all taxes and assessments becoming due on said premises and should keep the improvements on said premises insured for a sum of not less than $12,000, the policy to be placed in escrow. Snyders agreed to transfer all insurance then held by them on the improvements to the King Company who was to pay the pro rata volume of the same. It was further agreed Snyders would execute a warranty deed and deposit it together with the abstract of title in escrow.

The agreement further provided that in case King Company failed to make the payments provided for in a period longer than six months or failed to pay the taxes or supply insurance then the warranty deed and abstract were to be returned to Snyders and all payments made under the terms of the contract would be considered as rent and King Company was to immediately surrender possession to Snyders.

A part of the prefatory paragraph of the agreement reads as follows:

"Whereas the parties of the first part have this day *sold* the following described estate, to wit:

"(describing it.)" (Emphasis supplied.)

On April 14, 1961, Roy King Company, Ltd., assigned to Donald G. Rutherford and his wife, Marihta Rutherford, all of its right, title and interest in the Snyder contract and to the real estate described therein for the total sum of $74,250.00. On the same date an agreement, entitled contract of sale of real estate, was entered into between the Snyders and the Rutherfords for the total sum of $57,481.58, which was designated as the balance due Snyders in the assignment agreement between King Company and Rutherfords.

The contract between Snyders and Rutherfords, hereafter referred to as the Rutherford contract, provided generally for payments and the execution of a note and mortgage as had been provided for in the King Company contract. In the Rutherford contract it was announced that sellers (Snyders) agree to sell, convey and warrant unto buyers (Rutherfords) the real estate in question. Forfeiture in the Rutherford contract was changed from that provided for in the King contract in that a grace period of one year instead of six months was established. Escrow requirements as to both parties were detailed. Possession was transferred to Rutherfords as follows:

"3. Possession: Buyers shall have possession of the real estate hereby *sold* in present condition at the time and in accordance with the terms and conditions of certain assignment of even date from ROY KING COMPANY, LTD., a Delaware corporation, to BUYERS." (Emphasis supplied.)

On December 7, 1964, D. E. Snyder died. On that date the balance due on the Rutherford contract amounted to $49,458.96, which was reduced by a payment of Rutherfords to $43,000.00 on March 21, 1966. On December 18, 1964, May Snyder was appointed administratrix of the estate of D. E. Snyder. In November of 1965 the will in question was discovered and admitted to probate on December 27, 1965. T. D. Hampson, who was nominated in the will, was appointed executor.

The executor filed a petition for final settlement of the estate in which the ademption of the specific devise to the appellants was recognized. The appellants filed written defenses to the petition for final settlement asserting claims to the unpaid balance of the principal under the contract of sale to King Company and asking that the 840 acre ranch be assigned to Danny Snyder and Robert

Snyder subject to such contract of sale. The appellants made no claim to any cows or interest in any cows owned by the deceased at the time of his death.

On March 3, 1966, the probate court denied the executor's claim of ademption and assigned the 840 acre ranch to the two nephews, appellants herein, subject to the Rutherford contract and further ruled that the proceeds of the sale thereof, both principal and interest, paid since the death of the testator should be distributed one-half to Danny Snyder and one-half to Robert Snyder, and that the testator's one-half interest in the note of the Rutherfords should be assigned to the two nephews, the result being that May Snyder, the widow, would own one-half thereof and each nephew one-fourth. From this ruling of the probate court May Snyder appealed to the district court.

In March of 1966, the Rutherfords having made the required payments demanded and received the deed from the escrow agent.

On September 27, 1966, the district court heard the matter on a stipulation of facts and reversed the ruling of the probate court by holding that an ademption of the specific bequest to appellants had been effected at the time of the death of D. E. Snyder, and modified the probate court's order of distribution accordingly. The two nephews, Danny Snyder and Robert Snyder, thereupon perfected this appeal.

The provisions of the will of D. E. Snyder pertinent to our consideration read as follows:

"SECOND: I have enjoyed my experience as a farmer and a stockman, particularly in connection with the development of a Hereford herd. I want to make a provision for my nephews, Danny Snyder and Robert Snyder, with the particular thought that they likewise might carry on the Snyder name in connection with good farming practice and the further development of the Hereford cattle. I, therefore, give, devise and bequeath to Danny Snyder and Robert Snyder, my nephews, a 840 acre ranch situated in the northern part of Crawford County, Kansas, and in connection with said devise, bequeath to said Danny Snyder and Robert Snyder one hundred (100) Hereford cows, if I have that many at the time of my decease and if not, what cows I might have on said ranch at the time of my decease. The foregoing devise of said real estate is to the said nephews, to share and share alike, but with this further limitation: It is a condition and a limitation that said Danny Snyder and Robert Snyder, or either of them, shall not dispose of said ranch by sale, mortgage, encumbrance, or in anywise encumber it until the youngest of them shall have attained the age of forty-five years. In the event said Danny Snyder or Robert Snyder shall fail to pay the taxes upon said real property previous to the youngest attaining the age of forty-five years, then the land shall pass as hereinafter provided. In the event of the death of either Danny

Snyder or Robert Snyder before fee simple title passes absolute to them, then it is my will that the survivor take all. In the event that both Danny Snyder and Robert Snyder should become deceased before the youngest shall have attained the age of forty-five years, then it is my will and I devise in that event only that said 840 acre ranch pass to the bodily issue of said Danny Snyder and Robert Snyder, each child taking its percentage of the whole, that is, if Danny should have two children and if Robert should have four children and both the said Danny Snyder and Robert Snyder should be predeceased, each child would take a one-sixth.

"THIRD: In the event that said nephews, Danny Snyder and Robert Snyder, should fail to pay the taxes on said property and/or in the event that both of said devisees, Danny Snyder and Robert Snyder, should die before the youngest should attain the age of forty-five years, then and in that event it is my will that fee simple title to said property pass to that class who would be my heirs at law in the event my wife, May Snyder, had predeceased me."

The facts related, some of which will be further detailed in the course of this opinion, set the stage for our discussion.

We shall first examine the general nature of the common law doctrine of ademption and how it has been applied in this jurisdiction. The term is explained and defined in 6 Page on Wills (Bowe-Parker Revision), Ademption, § 54.1, pp. 241, 242:

"In modern law the term ademption has two distinct meanings. It is used with reference to the act of the testator in paying to the legatee, in the lifetime of the testator, a legacy which the testator has given to the legatee by will, or in satisfying such legacy by giving, in place thereof, something of value. This is sometimes spoken of as ademption by satisfaction. . . .

"The term 'ademption' is also used to indicate the loss of the legacy by the loss or destruction of the subject matter in the lifetime of the testator, or by the loss, transfer, or termination of the testator's interest therein before his death. This is sometimes referred to as ademption by extinction; . . ."

In the instant case we are concerned with what has been denominated as ademption by extinction. In Kansas the application of the common law doctrine was limited by statute in 1868 (G. S. 1868, Ch. 117, Sec. 33, [G. S. 1935, 22-236 and 22-237]). The statutes referred to barred the working of the ademption unless the testator by the instrument in question was wholly divested of an interest in the property previously devised with the execution provided for in 22-237, supra; that if the provisions of the instrument by which alteration of the testator's estate is made, are wholly inconsistent with the terms and nature of such previous specific bequests, a revocation still resulted. The statutes referred to were repealed in 1939 (Laws of 1939, Ch. 180, Sec. 280). Since then there has been no statutory control as to the application of the doctrine of ademption in this state.

In considering the effect of the statutes on the application of the common law doctrine, where a conveyance was made of previously devised property, in *Willoughby v. Watson*, 114 Kan. 82, 216 Pac. 1095 (1923), this court stated:

"At common law, before the Victorian Wills Act of 1837, a will of real estate spoke from its date, and was regarded as a specific appropriation of the land devised. Some consequences of these rules were considered in the case of *Kirkpatrick v. Kirkpatrick*, 112 Kan. 314, 211 Pac. 146. Another consequence was, if the testator altered his estate in the land, the devise was revoked, recalled or canceled, the accurate technical term being adeemed. . . ." (p. 83.)

In the *Willoughby* case a conveyance of real estate previously devised and the receipt of a mortgage and note therefore was held to defeat the devise on the grounds that such conveyance was so inconsistent with the devise as to work an ademption within the provision of the statutes then in effect.

In the case of *In re Estate of Hill*, 162 Kan. 385, 176 P. 2d 515 (1947), this court defines the term ademption as follows:

". . . Ademption is the term used to describe the act by which a specific legacy has become inoperative by the withdrawal or disappearance of the subject matter from the testator's estate in his lifetime, and where the testator sells or disposes of real or personal property which is the subject matter of a specific legacy, the sale or disposal, without more, results in an ademption and the legatee takes nothing of it under the will. See 69 C. J. 998, 1007. The following cases recognize the rule and its effect: *Kirkpatrick v. Kirkpatrick*, 112 Kan. 314, 211 Pac. 146; *Willoughby v. Watson*, 114 Kan. 82, 216 Pac. 1095; *Taylor v. Hull*, 121 Kan. 102, 245 Pac. 1026; *Warren v. Phebus*, 132 Kan. 816, 297 Pac. 657; *Myers v. Noble*, 141 Kan. 432, 41 P. 2d 1021; and other cases to the same effect might be cited. . . ." (pp. 393, 394.)

In a later case, in *In re Estate of Chevalier*, 167 Kan. 67, 204 P. 2d 748 (1949), it was held:

"Ademption is the term used to describe the act by which a specific legacy has become inoperative by the withdrawal or disappearance of the subject matter from the testator's estate in his lifetime." (Syl. ¶ 2.)

A definitive statement of the doctrine and the terms of its application, which we believe fairly describes the viewpoint adopted in this jurisdiction, is found in Atkinson on Wills (2d Ed.), Ademption, §134, p. 741:

"A testamentary gift of testator's specific real or personal property is adeemed, or fails completely, when the thing given does not exist as part of his estate at the time of his death. The doctrine now generally applies regardless of the intention of the testator, though if the change in the property is not substantial, there is no ademption."

In this jurisdiction the cardinal rule that a will speaks from the time of the testator's death unless it plainly shows a contrary intention, and is to be construed as operating according to the conditions and circumstances, has been adhered to consistently. See *Reetz v. Sims,* 177 Kan. 143, 276 P. 2d 368; *In re Estate of Works,* 168 Kan. 539, 213 P. 2d 998; and *Purl v. Purl,* 108 Kan. 673, 197 Pac. 185. It follows, therefore, that the question of whether or not a disposition by a testator of the subject matter of a specific bequest has worked an ademption of the bequest must be determined in the light of facts and circumstances existing at the time of testator's death.

In the instant case at the time of testator's death we find the following facts existing with respect to testator's interest in the ranch.

1. A bilateral agreement between Snyders and King Company for the sale and purchase had been executed on September 30, 1959, which was later affirmed by reference and supplanted by the bilateral contract of sale between Snyders and Rutherfords on April 14, 1961.

2. Instruments had been executed and deposited in escrow as provided for in Section 4 of the Rutherford contract as follows:

"4. ESCROW: On execution of this contract there is deposited with The Girard National Bank, Girard, Kansas, as Escrow Agent, the following instruments and documents for payment and delivery as follows:

"(a) SELLERS deed (with documentary stamps in proper amount attached but not affixed) conveying unto BUYERS fee simple merchantable title to the above described real estate to be delivered to BUYERS on April 1, 1966, or on BUYERS' payment on purchase price to a balance of FORTY THREE THOUSAND AND NO/100 DOLLARS ($43,000.00) whichever first occurs, at which time Escrow Agent shall deliver to SELLERS the real estate mortgage described in paragraph (b) below.

"(b) BUYERS' Promissory Note in the principal amount of FORTY THREE THOUSAND AND NO/100 DOLLARS ($43,000.00) and BUYERS' first real mortgage on the above described real estate securing said Promissory Note which Promissory Note and Mortgage shall be by said Escrow Agent delivered to SELLERS on April 1, 1966, or on BUYERS' payment on purchase price to a balance of FORTY THREE THOUSAND AND NO/100 DOLLARS ($43,000.00) whichever first occurs at the time of delivery to BUYERS of the Warranty Deed mentioned in paragraph (a) above.

"(c) Policies of fire, windstorm and other hazards extended coverage insurance on the improvements on real estate sold in the amount of $12,000.00 endorsed with loss payable to the parties as their interest may appear.

"(d) The fee of said Escrow Agent shall be paid by BUYER.

"(e) Abstract of Title (to be deposited after examination by BUYERS' Attorney)."

(All of such instruments were dated and executed on April 14, 1961, the date of the Rutherford contract.)

3. Snyders had received $13,541.04 on the purchase price.

4. Snyders had dispersed of their Hereford herd, retaining only five cows and six or seven calves.

5. Possession of the ranch had been given to the King Company in October 1959 when Snyders moved to their home south of Girard, Rutherfords succeeded the King Company in possession of the ranch October 1961.

The specific question then presented for our determination is whether or not, under the facts and circumstances related, the interest of D. E. Snyder in the ranch was altered or disposed of at the time of his death to such an extent as to work an ademption of the specific devise to appellants; their rights to the proceeds of the sale being determined thereby.

The appellants claim the contract here was only an executory contract to sell in the future; that at the time of testator's death his interest therein was still that of real property, and, therefore the contract was insufficient to operate a revocation of the devise by the application of the doctrine of ademption. Appellees, on the other hand, contend that even though the Rutherford contract is considered an executory contract at the time of D. E. Snyder's death, nevertheless his interest in the real estate in question had undergone such a substantial change that the previous devise thereof must be considered adeemed.

The effect of an executory contract to sell and convey real estate on the interest of the vendor therein at his death with respect to the disposition of the proceeds of the sale has often been a subject of judicial examination. Problems in connection therewith have been resolved with some difficulty in this state, as well as in most jurisdictions. The problem has necessitated determination not only where the ademption of a specific bequest was at issue, but even more frequently where it was necssary to determine whether a vendor's interest was that of personalty or realty in order to resolve questions of succession in both testate and intestate estates.

The general rule is set out in 57 Am. Jur., Wills, §1586, p. 1087, as follows:

"Where a testator contracts to sell property which he has specifically devised or bequeathed in a previously executed will, it is generally agreed that

. purchase money thereafter paid in accordance with the contract, whether before or after testator's death, does not pass under the gift but is to be disposed of as personalty, unless, as is sometimes the case, a different result is required by the provisions of applicable statutes."

The application of the rule in terms of what the text writer describes as the orthodox rule is set out in Atkinson on Wills (2d Ed.), Ademption, §134, pp. 744, 745, as follows:

". . . When the property bequeathed or devised has not been conveyed but only subjected to a contract of sale by the testator, the orthodox view is that the testamentary provision is adeemed and that the right to enforce the contract and receive the proceeds does not pass to the legatee or devisee. Some jurisdictions have statutes to the effect that an executory contract of sale does not work an .ademption."

While particular distinction have been made depending upon the terms and nature of the contract involved, we believe the decisions of this court on the subject are substantially in accord with the general rule.

The appellants rely principally on the case of *Pickens v. Campbell,* 104 Kan. 425, 179 Pac. 343, to support their position. Ademption was not involved in the *Pickens* case. The question there was whether the interest of deceased in certain Kansas real state was wrongfully inventoried as real estate rather than personal property in the assets of his estate. The *Pickens* controversy was reviewed by this court in two appeals (*Pickens v. Campbell,* 98 Kan. 518, 159 Pac. 21, and *Pickens v. Campbell,* 104 Kan. 425.) Both opinions must be examined to understand the nature of the controversy. The action was initiated by two collateral heirs (Pickens and Schutt) of one Fensky, a California resident, who owned Kansas real estate, which he had contracted to sell prior to his death. The action was brought to set aside the final settlement of the Kansas ancillary administration on the grounds that Campbell, a Kansas lawyer who had been appointed administrator in Kansas, had fraudulently inventoried the property as real estate rather than personal property. In the first appeal, perfected by Campbell, a judgment of the trial court overruling a demurrer to the petition on the grounds that it stated a cause of action based on extrinsic fraud was affirmed by this court. The case was then tried and resulted in a judgment for defendant Campbell from which plaintiffs Pickens and Schutt appealed. The trial court's judgment was premised on the proposition that the contracts involved were to effect a future rather than a present sale. The judgment was affirmed. (104 Kan. 518.)

Appellants claim the contracts in *Pickens* were so similar to that in the case at bar as to be determinative of the issue here. We cannot agree with the position taken by the appellants. It is true that the language contained in the *Pickens* contracts—agrees to sell and convey—was similar to language used in the case at bar in the Rutherford contract where Snyders, as sellers, "hereby agree to sell, convey and warrant." However, in the King contract the parties state that they have this day sold the following described real estate and then agree to execute a deed and deposit the same together with other instruments in escrow. In *Pickens* the deeds were withheld by the vendor, Fensky, not to be delivered until payment in full had been received, and upon default the contracts were subject to immediate termination.

The *Pickens* contracts were described in the opinion as follows:

". . . Title was withheld; performance by the vendee at the time stipulated was a condition precedent to the acquisition of title; default entailed forfeiture of payments already made, and right of possession; the vendor was then at liberty to reenter or to invoke the remedy of ejectment; and insertion of the formula, 'Time is of the essence of this contract,' would have been superfluous." (pp. 427, 428.)

It was further stated:

"In this case most of the lots were sold for small payments to be made during considerable periods of time, and it is quite clear that Ferdinand Fensky intended to forestall lawsuits by requiring purchasers to accept contracts which provided for strict performance, under penalty of forfeiture. . . ." (p. 428.)

A careful analysis of the opinions in the two *Pickens* appeals leads to the conclusion that the court found Campbell, a Kansas lawyer, not guilty of fraud, as administrator, in inventorying the property as real estate rather than personal property, because the contracts were little more than options with nominal down payments, subject to immediate termination upon any default by the buyers. In other words, we believe the final decision in *Pickens* was reached on the premise that so little change or alteration had been effected in the deceased's interest in the property that it was not fraud on the part of Campbell to inventory it as realty rather than personalty.

We have examined the cases cited by both parties and in our research examined many others in which this court has delineated various factors to be considered in determining whether or not the interest of a deceased in real property had been so altered by an executory contract of sale as to effect a conversion from realty

to personalty. The most recent case in which the problem was considered is that of *In re Estate of Taylor*, 185 Kan. 523, 345 P. 2d 1028. In the *Taylor* case the will of testatrix (Maggie Taylor) directed:

". . . [I]n the event I have not disposed of the property at 2323 Elmwood Street, Kansas City, Kansas, at the time of my death, that it go into and become a part of the assets of my estate, . . ." (p. 524.)

A year and nine months prior to her death, Mrs. Taylor, executed an instrument denominated "Option Contract" to sell the Elmwood street property. The sale price under the option contract was $4,065.45, approximately $1,500 of which had been paid at the time of the death of Mrs. Taylor.

This court held the option agreement to be in fact an executory contract of sale and in the opinion the status of the interest of the decedent in real property, under an executory contract of sale at the time of death, was discussed in depth. There it was stated:

"It cannot be gainsaid that an executory contract providing that the owner of property will convey certain real estate to another by warranty deed warranting the title thereto as of the date of the contract, upon the making and completion of the installment payments therein set forth, has placed that property out of his control to such an extent that it has been disposed of. The fact, as we have seen, such an agreement contains provisions for its forfeiture for nonpayment or a breach of its other terms and conditions does not warrant a contrary conclusion as is urged by appellant. Therefore we hold that the trial court did not err in its ruling that as a matter of law the involved contract disposed of the real property known as 2323 Elmwood Street, Kansas City, Kansas, within the meaning of Paragraph 4 of the will.

. . . . . . . . . . . . .

"Finally it is urged that the trial court erred in holding (1) that the proceeds collected to date or hereafter collected under the involved contract should go to the assets of the estate to be distributed to the other devisees and legatees set out in the will and not be treated as a specific devise to the surviving husband and (2) that if such contract is sold by the probate court, then the proceeds of such sale should go to the assets of the estate to be distributed to the other devisees and legatees set out in the will and not be treated as a specific bequest to the surviving husband. These questions can be considered together.

"In *Pickens v. Campbell*, 98 Kan. 518, 522, 159 Pac. 21, it is said that ordinarily the right to the purchase price of land, contracted to be sold but not conveyed at the time of the vendor's death, passes to his personal representative and not to his heirs. Such is the general rule. See 55 Am. Jur., Vendor and Purchaser, pp. 785, 786, § 359, which reads:

" 'The equitable principle that the interest of the vendor under an executory land contract is to be regarded as personalty has been frequently applied in the distribution of a deceased vendor's estate; accordingly, it is held that the

vendor's interest in the land which he has contracted to sell passes to his personal representative as personalty, together with the right to the unpaid purchase money and securities therefor, . . .'

"Application of the foregoing rule means that proceeds received or to be received under the contract are to be distributed in accord with operative provisions of the will and that the trial court's rulings on the two questions last above mentioned were proper and must be upheld." (pp. 527, 528, 529.)

Similar cases in which real property, under an executory contract of sale, has been held to have been converted into personalty and the proceeds distributed as assets of decedent's estate are: *Courtney v. Woodworth,* 9 Kan. (2d Ed.) *443, where a purchaser was given a title-bond, put in possession, and time not made of essence, it was held the vendor may treat the bond as an equitable mortgage. The same result was obtained in *Chambers v. Anderson,* 51 Kan. 385, 32 Pac. 1098, where a contract and deed were deposited in escrow.

In *Jones v. Hollister,* 51 Kan. 310, 32 Pac. 1115, the vendor received part of the purchase price and took a promissory note for deferred payments, put vendee in possession and, time not being the essence of the contract, it was held the entire equitable estate passed to vendee or his assigns.

A contract, closely akin to those considered here, was the subject of examination in *Gilmore v. Gilmore,* 60 Kan. 606, 57 Pac. 505. There the contract provided that the deed, notes and mortgage were to be deposited in escrow until notes were reduced to a fixed amount, the vendor dying prior thereto, it was held:

". . . A contract for the sale of real estate works an equitable conversion of the land into personalty from the time when it was made, and the purchase-money becomes, thereupon, a part of the vendor's personal estate, . . . "(pp. 609, 610)

Similar holdings are to be found in *Williams v. Osage County,* 84 Kan. 508, 114 Pac. 858; *Gordon v. Munn,* 87 Kan. 624, 125 Pac. 1; *Gault v. Hurd,* 103 Kan. 51, 172 Pac. 1011; *Yost v. Guinn,* 106 Kan. 465, 188 Pac. 427; *Neal v. Owings,* 108 Kan. 73, 194 Pac. 324; *Gamer v. Piper,* 125 Kan. 395, 264 Pac. 1071; *In re Estate of Elliott,* 174 Kan. 252, 255 P. 2d 645; *Farrell v. The Federal Land Bank of Wichita,* 175 Kan. 786, 267 P. 2d 497.

The cases cited are not intended to represent a complete collection of Kansas cases on the subject. However, they portray a consistent attitude in this jurisdiction from which the conclusion may be drawn that where a contract of sale provides for the execution and deposit of a deed in escrow, a transfer of possession, a substantial down payment, and where time is not made of essence, the

interest of vendor is converted from realty to personalty, as of his death, and the proceeds distributed accordingly. While all of the elements are not to be found in all of the cases cited, we find those which we have mentioned to be of persuasive significance and the most frequently considered.

Some of the cases in which a contrary conclusion was obtained are: *Douglas Co. v. Union Pac. Ry. Co. E. D.*, 5 Kan. (2d Ed.) *615; *Brown v. Thomas, Sheriff*, 37 Kan. 282, 15 Pac. 211; *Aigler v. Land Co.*, 51 Kan. 718, 33 Pac. 593; *Pickens v. Campbell*, 104 Kan. 425, 179 Pac. 343; *Kansas Power Co. v. Smith County Comm'rs*, 122 Kan. 252, 251 Pac. 1114; *Johnson v. Kroeker*, 130 Kan. 620, 287 Pac. 241.

In many of the cases last cited the contract in question was held to be merely an option. In some a deed was not executed or if so then not deposited in escrow but withheld by vendor. In none of them are all of the elements previously mentioned found to be in existence on the death of a decedent.

A careful analysis of the decisions which we have cited leads to the conclusion that the issue to be resolved rests, not so much on whether or not the contract is to be classified as an option, one for sale in the future or one for present sale, but rather on the proposition whether the provisions of the contract and the performance had in connection therewith, prior to the vendor's death, effect such an alteration or substantial change in vendor's interest as to convert it from one of realty to personalty.

In the instant case the King contract, the King assignment to Rutherfords, confirmed and referred to in the Rutherford contract, and the Rutherford contract itself, are all to be considered in our determination. As we have indicated, some language is to be found in the King contract indicating an intention of the parties that the land in question had been sold. We have not, however, reached our conclusion on a basis of the tense used in the contract but rather on the alteration and substantial change wrought in the interest of D. E. Snyder at the time of his death. There is no express provision making time the essence in either the King or Rutherford contracts.

In *Russell v. Ferrell*, 181 Kan. 259, 311 P. 2d 347, it was held:

"Time is not ordinarily regarded as of the essence of a contract unless it is so stipulated by express terms, or is necessarily implied from the character of the obligations assumed; this is especially true with respect to executory contracts for the sale of real estate which are considered in equity as vesting the equitable title in the purchaser subject to the claim of the vendor for the purchase money." (Syl. ¶ 1.)

Under the Rutherford contract the deed was executed, documentary stamps attached and deposited in escrow along with vendees' executed promissory note and mortgage. The vendees had long been in possession at the time of vendor's death. A forfeiture grace period of one year was provided for, interest on past due payments was increased from five to eight percent, a provision which proscribes any inference that time was of the essence. The Rutherford contract contained bilateral agreements which clearly subjected the contract to specific performance.

For the reasons stated we hold the Rutherford contract and the related facts and circumstances to have so substantially changed the interest of D. E. Snyder in the real estate in question at the time of his death so as to work an ademption of the specific bequests in question.

The appellants complain as to a number of the trial court's findings of fact. We have examined appellants' contentions in this regard and their arguments in support thereof in the light of the record. While some of the findings appear to be superfluous or immaterial they cannot be said to derogate the correctness of the trial court's judgment. It is therefore affirmed.